■ CHURCH OF SCIENTOLOGY OF NEW YORK, Respondent, v STATE OF NEW YORK et al., Appellants. CHURCH OF SCIENTOLOGY OF NEW YORK, Respondent, v STATE OF NEW YORK et al., Appellants.—Judgments, Supreme Court, New York County, entered on May 26, 1977 and August 29, 1977, respectively, in which petitioner's application pursuant to sections 85 through 88 of the Public Officers Law for records pertaining to petitioner were granted with limitations requiring deletions of the names of third parties (judgment of May 26, 1977) and the names and addresses of third parties in complaint letters (judgment of Aug. 29, 1977) affirmed, without costs and without disbursements. Following applications to the respondents pursuant to sections 85 through 88 of the Public Officers Law (Freedom of Information Law), resulting in making available some records, but the withholding of most, petitioner commenced these proceedings, seeking a judgment directing respondents to make available to them the requested records and documents. The two petitions, one addressed to the Department of Mental Hygiene, and the second to the Attorney-General, resulted in judgments directing the respective respondents to make available to petitioner for inspection and copying the records sought, subject to the limitation in the judgment concerning the Department of Mental Hygiene that the names of third parties be deleted, and the limitation in the judgment relating to the Attorney-General that the names and addresses of informers who wrote letters of complaint be deleted. The affidavits before the court sharply limited the issues presented in the pleadings. Whatever questions may be thought to have been raised by these determinations at Special Term have been substantially eliminated by the enactment of a new article 6 of the Public Officers Law, effective January 1, 1978 (L 1977, ch 933, § 1) and now controlling, which substantially extends the obligation of government agencies to make available their records and files. So far as is now relevant, the only issues remaining are raised by the Attorney-General and involve

interpretation of the following pertinent portions of section 87 of the Public Officers Law: "Access to agency records * * * 2. Each agency shall, in accordance with its published rules, make available for public inspection and copying all records, except that such agency may deny access to records or portions thereof that: * * * (e) are compiled for law enforcement purposes and which, if disclosed, would: i. interfere with law enforcement investigations or judicial proceedings * * * iii. identify a confidential source or disclose confidential information relating to a criminal investigation". We are satisfied that the provisions of the judgment below adequately protect against the inappropriate identification of "a confidential source." This seems particularly clear since, as was developed on oral argument, the sources in question are the authors of confidential letters of complaint and it was the practice of the Attorney-General on an on-going basis to communicate with petitioner with regard to such complaints. It is difficult in this context to believe that more is necessary to protect the identity of such people than the deletion of their names and addresses, already required in the judgment appealed from. The alternatives suggested would effectively undermine the disclosure purposes of the statutory sections. Nor were any specifics presented either in the moving papers or an oral argument that support the conclusion that an *in camera* inspection of the individual papers would be helpful on this issue. As to the further claim that some of the documents sought were compiled for law enforcement purposes, and if disclosed would interfere with law enforcement investigations or judicial proceedings, it is apparent from the facts submitted that the letters of ·complaint have already been responded to, have been the subject of inquiry, have resulted in no further action, and that there presently exists no intention to commence any further action with regard to them. What we are left with is the wholly speculative proposition that something may yet turn up, although it has not yet done so in the many years of the petitioner's existence, that will require some unspecified law enforcement action, to which these earlier letters may be relevant and that somehow will be impaired by disclosure. More than that is surely required to invoke the exception claimed by the respondents. Neither the papers submitted on behalf of the respondents, nor the responses to specific inquiries in connection with this area on oral argument, provide a colorable factual basis for the view that an *in camera* inspection would serve any worthwhile purpose. No such inspection, it should be noted, was suggested by the respondents in the various papers submitted by them. Needless to say, we do not doubt, as urged in the thoughtful dissenting opinion, that there may well be appropriate situations in which *in camera* inspection would serve the useful purpose of balancing the rights of private citizens and organizations with the legitimate needs of government agencies. Concur—Murphy, P. J., Birns, Yesawich and Sandler, JJ.; Lupiano, J., dissents in a memorandum as follows: Petitioner, the Church of Scientology of New York (L. Ron Hubbard, founder), instituted these article 78 proceedings to obtain access to all the files of the Commissioner of Mental Hygiene and the Attorney-General, respondents herein, concerning the petitioner corporation, its affiliates and its leadership.* Respondents gave petitioner access to nonconfidential files.

---

* Petitioner's letter of protest addressed to the Attorney-General, dated October 29, 1975, appeals the refusal of the latter to disclose "all records on Scientology Churches and Missions, L. Ron Hubbard, Dianetics, et al." The subject matter of Dianetics and the subject matter with which the Scientology Churches concern themselves are embraceable within that sphere of human experience termed Mental Hygiene.

Further disclosure was denied by the Attorney-General on the ground that the records either do not come within the description of subdivision 1 of section 88 of the Public Officers Law, or are part of the Attorney-General's investigative files, or that their disclosure would invade the privacy of the Attorney-General's informants (Public Officers Law, former § 88, subd 7, pars c, d). Similarly, the Commissioner of Mental Hygiene denied petitioner access as to internal memoranda and as to those records which had been furnished to him by the Attorney-General for the same reasons urged by the Attorney-General. In the proceeding against the Attorney-General, Special Term, granted the application "in the absence of sufficient information concerning the documents to sustain respondent's refusal to disclose for the reasons stated. Insofar as the documents sought to be disclosed are complaint letters addressed to the respondent, disclosure of the contents of said letters is granted but the names and addresses of the informers shall be excluded from such disclosure." In opposing the application, the Attorney-General declared: "Heretofore, the Attorney General commenced an investigation into the affairs of The Church of Scientology, its leadership and related organizations following the receipt of a number of complaints from members of the public. It should be emphasized that the Attorney General has no interest in the religious or philosophical beliefs of the petitioner or any other body, regardless of how novel or unconventional they may be. However, the law imposes upon the Attorney General a duty to investigate and prosecute frauds committed in connection with receipt of funds and fund raising for ostensibly religious and charitable purposes. The investigation was confined to allegations of such fraudulent activity. *Although the investigation did not disclose evidence sufficient to warrant the commencement of criminal proceedings, additional complaints are received from time to time and the file remains open.* The letters of complaints are subject to the common law informers privilege. Similarly the investigative file is privileged, both at common law and under the Freedom of Information Law. *Disclosure of these records could result in an unwarranted invasion of the privacy of these informants.* Although respondents have made available to petitioner its non-confidential files, their privileged records must be protected. *The mischief that would be caused by wholesale disclosure of informants' complaints or investigative files as sought by petitioner would be highly prejudicial to law enforcement and governmental administration; something the Freedom of Information Law was never intended to cause"* (emphasis supplied). The Freedom of Information Law adopted by New York State, effective September 1, 1974, is designed to make available to the public documents generated by and in the possession of government unless a compelling reason requires their confidentiality. Concern was expressed in the statute regarding the rights of those identified by government documents which might be subject to disclosure. The law authorizes the Committee on Access to Public Documents to spell out rules to be used in preventing the disclosure of information in violation of a person's right of privacy. As set forth in section 89 (subd 2, par [a]) of the Public Officers Law, "The committee on public access to records may promulgate guidelines regarding deletion of *identifying details* or withholding of records otherwise available under this article to prevent unwarranted invasions of personal privacy. In the absence of such guidelines, an agency may delete *identifying details* when it makes records available" (emphasis supplied). A further limitation on access to information is set forth in subdivision 2 of section 87 of the Public Officers Law, which declares: "Each agency shall * * * make available for public inspection and copying all records, except that such agency

may deny access to records or portions thereof that: * * * (b) if disclosed would constitute an unwarranted invasion of personal privacy under the provisions of subdivision two of section eighty-nine of this article; * * * (e) are compiled for law enforcement purposes and which, if disclosed, would: i. interfere with law enforcement investigations * * * iii. identify a confidential source or disclose confidential information relating to a criminal investigation; or iv. reveal criminal investigative techniques or procedures, except routine techniques and procedures; (f) if disclosed would endanger the life or safety of any person; (g) are inter-agency or intra-agency materials which are not: i. statistical or factual tabulations or data; ii. instructions to staff that affect the public; or iii. final agency policy or determinations". It is pointed out by the Attorney-General that although at present a criminal prosecution is not warranted, petitioner remains under *active* scrutiny and complaints continue to be received by the Attorney-General. As a consequence of evidence that may be gathered in the future, argues the Attorney-General, items currently in the files may assume vital importance. In essence, the issue is framed as to whether the investigative file is completed and closed, in effect, a "dead" file, or whether it is an open, viable file, albeit a dormant one which, if subject to disclosure, would result in interference with the law enforcement investigative function of the Attorney-General's office. In this connection, it must be noted that petitioner in seeking access to the Attorney-General's records implicitly recognizes the exemptions to such access delineated in the Public Officers Law. Petitioner in paragraph 14 of the petition states: "The conduct of Respondents, insofar as the records withheld by Respondents do not constitute files 'compiled for law enforcement purposes,' constitutes a violation of The Freedom of Information Law." Recognition of the spirit and intent of the Freedom of Information Law and the recognized caveat that the statute is to be liberally interpreted to achieve its goal, does not mandate judicial legislation weakening the status of countervailing considerations and rights which prompted the limitations on access to information specifically enacted by the Legislature in its wisdom. In this regard note is taken of the general observation in a pre-Freedom of Information Law case that "Public interest is a flexible term and what constitutes sufficient potential harm to the public interest so as to render the privilege [of confidentiality attaching to official information in the hands of governmental agencies] operable must of necessity be determined on the facts of each case. Such a determination is a judicial one and requires that the governmental agency come forward and show that the public interest would indeed be jeopardized by a disclosure of the information. Otherwise, the privilege could be easily abused, serving as a cloak for official misconduct * * * Of course, in some situations it may be difficult to determine if the assertion of the privilege is warranted without forcing a disclosure of the very thing sought to be withheld. In such situations, it would seem proper that the material requested be examined by the court *in camera" (Cirale v 80 Pine St. Corp.,* 35 NY2d 113, 118-119). The public policy benefit in not discouraging private citizens from making complaint or informing as to observed criminal activity to the proper authorities is self-evident. On numerous occasions, the courts have commented upon the duties of citizenship and the responsibilities attendant thereon. As an example, the Court of Appeals stated in *People v Hicks* (38 NY2d 90, 94): "The average citizen who provides the authorities with information as to observed criminal activity does so with no expectation of private gain. Rather, he aids the police in enforcing the laws in order to promote the safety and order of the society as a whole". While mindful of the reality of

the public's right to know insofar as this right has found utterance in the Freedom of Information Law, the concern expressed for protecting the legitimacy of the right to privacy and the State's compelling interest in maintaining the integrity of investigatory files and of criminal justice files, mandates under the circumstances herein an *in camera* inspection by the court so that an informed determination can be made as to whether the records sought by petitioner pertain to law enforcement purposes, the disclosure of which would interfere with law enforcement investigation. We must be mindful that the expansion of one right—in this case the public's right to know under the Freedom of Information Law—might well toll the confinement of other rights, for example, the right of privacy, in the delicate balancing of private as compared or contrasted with public issues and/or persons. It is, therefore, concluded that Special Term regarding the right of privacy limitation erred in limiting deletion of merely the names and addresses of the informers and complainants from complaint letters in the documents sought to be disclosed. In accordance with the Freedom of Information Law all identifying details necessary to prevent unwarranted invasion of personal privacy should be deleted from any information sought to be disclosed and such deletion should not be merely limited to complaint letters. Further, insofar as the records sought to be disclosed are compiled for law enforcement purposes, the disclosure of which would interfere with law enforcement investigation, an *in camera* inspection of the records is in order to protect the legitimate interest of the public in safeguarding the integrity of the investigative process. The disclosure by the Attorney-General of "sufficient information concerning the documents to sustain [the Attorney-General's] refusal to disclose for the reasons stated," may well compromise the integrity of the investigative process. It was incumbent upon Special Term to make an *"in camera"* inspection so that its determination would be an informed one. Common sense and reason dictate that such *in camera* inspection would best comport with protecting the competing interests and rights under the Freedom of Information Law. Regarding the article 78 proceeding against the Commissioner of Mental Hygiene, Special Term granted the application. In rendering its determination, Special Term pertinently observed that the commissioner refused to divulge "material received from the Attorney General with instructions to retain confidentiality, internal working memoranda of a confidential nature, and communications received from third parties, some of whom are alleged to have been representatives of the petitioner." The basis enunciated by Special Term for permitting access to this material was the commissioner's admission that he is not conducting any activity with respect to petitioner and maintains no records with respect to petitioner. Concluding that there was no "real and active ongoing investigation," Special Term declared that there was no justification for withholding the information provided the identity of third parties was protected. The observations delineated above in respect of the proceeding involving the Attorney-General apply equally to this proceeding. The Freedom of Information Law as originally enacted was recently reported and replaced by a (new) Freedom of Information Law, effective January 1, 1978 (L 1977, ch 933). The sponsor of this law stated in the memorandum in support of the new act that it "Mandates that *all* records be open except: * * * 2. those records which would be an invasion of privacy * * * 5. law enforcement investigations * * * *In camera* inspection of records together with the possible assessment of attorneys fees are existing powers given the courts which are contained in this legislation * * * The main purpose of these amendments are to clarify, streamline and better

effectuate the original intent of this legislation. Basically, this legislation will conform New York State's version of Freedom of Information to the Federal law." (NY Legis Ann, 1977, pp 330, 331.) The Federal statute which is analogous to New York's Freedom of Information Law and to which New York's version conforms specifically provides for *in camera* inspection—"On complaint, the district court of the United States * * * has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action" (US Code, tit 5, § 552, subd [a], par [4], cl [B]). Exempt material under the Federal statute is, insofar as relevant to this matter, phrased in similar language to New York's statute—"This section does not apply to matters that are—* * * (7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings * * * (C) constitute an unwarranted invasion of personal privacy (D) disclose the identity of a confidential source" (US Code, tit 5, § 552, subd [b], par [7]). Enlightenment may thus be obtained from a review of relevant Federal cases. Initially the request for disclosure should specify identifiable records, i.e., it should contain a reasonable description of the requested records and not be vague (see *Bristol-Myers Co. v Federal Trade Comm.*, 424 F2d 935). The mere fact that an investigatory file is dormant, does not of itself indicate that it is not related to a viable on-going investigation and does not remove the file from the exemption provided in the statute. In *Frankel v Securities & Exch. Comm.* (336 F Supp 675, 678) the District Court held that the exemption from disclosure pertaining to an investigatory file no longer applied where the file was not one " 'compiled for [current] law enforcement purposes.' " The Second Circuit Court of Appeals noted that "The statute on its face does not limit the 'investigatory files' exemption to files that the agency is currently using or is planning to use in a law enforcement proceeding * * * The broad legislative intent behind the enactment of the Freedom of Information Act, as disclosed by the Report of the Senate Committee on the Judiciary and the Report of the House Committee on Government Operators, was to give the electorate greater access to information concerning the operations of the federal government. The ultimate purpose was to enable the public to have sufficient information in order to be able, through the electoral process, to make intelligent, informed choices with respect to the nature, scope, and procedure of federal governmental activities * * * The House Report * * * states: 'It is vital to our way of life to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy. The right of the individual to be able to find out how his Government is operating can be just as important to him as his right to privacy and his right to confide in his Government. This bill strikes a balance considering all these interests.' [The Senate and House] Reports indicate that Congress had a two-fold purpose in enacting the exemption for investigatory files: to prevent the premature disclosure of the results of an investigation so that the Government can present its strongest case in court, and to keep confidential the procedures by which the agency conducted its investigation and by which it has obtained information. Both these forms of confidentiality are necessary for effective law

enforcement. The conclusion that the * * * exemption from disclosure applies even after an investigation and an enforcement proceeding have been terminated is supported both by the authority of the cases decided under the Act and by consideration of the policies underlying the Act in general and the investigatory files exemption in particular. In *Evans v. Department of Transportation*, 446 F.2d 821, 824 (5th Cir.) * * * the court said: 'We are of the further opinion that Congress could not possibly have intended that such [matter] should be disclosed once an investigation is completed. *If this were so, and disclosure were made, it would soon become a matter of common knowledge with the result that few individuals, if any, would come forth to embroil themselves in controversy or possible recrimination by notifying the [agency] of something which might justify investigation.'* * * * If an agency's investigatory files were obtainable without limitation after the investigation was concluded, future law enforcement efforts by the agency could be seriously hindered * * * The possibility of such disclosure would tend severely to limit the agencies' possibilities for investigation and enforcement of the law since these agencies rely, to a large extent, on voluntary cooperation and on information from informants. In the present case disclosure would have but small effect with respect to the general purposes of the Act, the better informing of the electorate as to the operations of government. On the contrary it would defeat important purposes of the exemption for investigatory files" *(Frankel v Securities & Exch. Comm., 460 F2d 813, 815-818)* (emphasis supplied). The critical fact as to a dormant investigative file determinative of whether the exemption provision applies is whether such file remains viable as an aid in a contemplated prospective proceeding (see *Bristol-Myers Co. v Federal Trade Comm., supra; Chamberlain v Alexander*, 419 F Supp 235; cf. *Weisberg v United States Dept. of Justice*, 489 F2d 1195, cert den 416 US 993; 543 F2d 308). Accordingly, it is necessary for the court where appropriate to apply the balancing test delineated in the Federal cases, coupled when necessary with *in camera* inspection of the records sought in order to determine whether the exemption is properly invoked. The focus is on "how and under what circumstances the files were compiled" *(Aspin v Department of Defense*, 491 F2d 24). To reiterate: petitioner seeks access to *all* records in the possession of respondents *without any limitation or degree of specificity* other than that the records relate to petitioner, its innumerable affiliates and its leadership. There has been a disclosure by respondents of information not considered by them of a confidential investigative nature. Accordingly, inference supports an initial reflection that respondents are acting in good faith. Exemption is claimed for letters of complaint received by the Attorney-General and related matters of an investigatory nature relevant to the Attorney-General's duty to investigate and prosecute certain fraudulent activity. The Attorney-General turned over to the Commissioner of Mental Hygiene certain records which are claimed to be confidential and related to an investigation of certain allegations of fraudulent activity. It is specifically stated that the Attorney-General's file "remains open." The mere fact that such information has been imparted by one agency to another does not of itself remove the exemption, if it is otherwise operable, particularly where the information is turned over under a request that its confidential status be respected. The mere fact that the agency to which the records are turned over is itself not pursuing an investigatory process respecting such records does not deprive those records of the exemption if otherwise applicable. Indeed, section 87 (subd 2, par [g]) of the Public Officers Law provides a specific exemption for "inter-agency or intra-agency materials which are

not: i. statistical or factual tabulations or data; ii. instructions to staff that affect the public; or iii. final agency policy or determinations." As to materials in the files of the Department of Mental Hygiene which have not been disclosed and which are not records and papers of the Attorney-General, it is urged that the above exemption controls, i.e., that these materials are all inter- or intra-agency memoranda not otherwise subject to disclosure. "It should be observed that the Federal statutes relating to freedom of access to governmental information are not based upon a fundamental finding that the public should have unimpaired access to records" (Matter of Dunlea v Goldmark, 54 AD2d 446, 449). In the post-Watergate milieu the understandable zeal to interpret as liberally as possible the Freedom of Information Act cannot justify a myopic or one-sided approach which would serve to frustrate the balancing test patently envisioned by the statutory enactment. Both Congress in enacting the Federal Freedom of Information Law and the State Legislature of New York in enacting the State's Freedom of Information Law were mindful of the salutary observation not to cure the patient by killing him. The nature of the right of privacy which may well be the most threatened right of our present age, the competing consideration of the public's right to know what government is doing in order through the electoral process and otherwise to make informed choices with respect to the value, scope and procedure of governmental activities and the competing consideration of safeguarding effective law enforcement—all warrant, indeed mandate, a reflective, cautious, albeit liberal approach in applying the Freedom of Information Law. We must be careful not to abuse rights or reject countervailing duties in invoking the Freedom of Information Law. Eternal vigilance is the price of liberty and vigilance in applying the law is not remiss. Respondents clearly oppose what they perceive as an unbridled, unlimited raid on their confidential files and records and invoke the protection of the Freedom of Information Law, the very law relied upon by petitioner to justify access to such files and records. We assume "[T]here is no evidence in this record, other than the conclusory affidavit of the respondents, to confirm these claims of exemptions. It has been held under the Federal statute that conclusory affidavits claiming a right to an exemption will not alone defeat a request for disclosure (see Environmental Protection Agency v Mink, 410 US 73, 93; Vaughn v Rosen, [484 F2d 820, cert den 415 US 977]). A New York court while recognizing that investigatory files must remain confidential, went on to state: '[B]ut that does not mean that a general statement * * * that records are confidential or part of an investigatory file * * * must result in dismissal * * *. [I]t would frustrate the intent and policy of the Freedom of Information Law to permit a public official to determine according to his own judgment what is, or is not, confidential and to withhold disclosure accordingly' (Matter of Dillon v Cahn, 79 Misc 2d 300, 303, citing United States v Nixon, 418 US 683). In the instant case the minutes sought by the petitioners have not been reviewed in camera and there are no detailed affidavits or other exhibits that would show the type of information generally contained in these minutes. While an agency should be accorded an opportunity to prove by means other than an in camera inspection that they are entitled to an exemption, if they fail to provide such detailed information an in camera inspection of the documents sought should be performed (Vaughn v Rosen, supra; see Cirale v 80 Pine St. Corp., 35 NY2d 113, 119, supra; Matter of Dillon v Cahn, supra)" (Matter of Zuckerman v New York State Bd. of Parole, 53 AD2d 405, 408). Accordingly, the judgments of the Supreme Court, New York County, entered May 6, 1977 and August 29,

1977, granting petitioner's application for access to records under the Freedom of Information Law should be reversed, on the law and the facts, without costs, and the proceedings remanded to the Supreme Court for an *in camera* inspection of the requested documents and for further proceedings not inconsistent herewith.