*603 OPINION OF THE COURT
Martin B. Stecher, J.
In this CPLR article 78 proceeding, petitioner seeks judgment to compel respondent to comply with petitioner’s request for information pursuant to the Freedom of Information Law (FOIL) (Public Officers Law art 6). The items sought are documents and records in the possession of the Attorney-General generated in a United States District Court case entitled State of New York v Matsushita Elec. Corp.
According to the petition, the petitioner maintains a retail store for the sale of stereo equipment and other consumer electronics in Williamsville, New York. It was a distributor of "Technics” and "Panasonic” products which are alleged to be divisions of Matsushita (hereafter referred to as Matsushita or Technics or Panasonic). According to the petitioner, the petitioner "did not adhere to the resale price maintenance scheme sought to be imposed by Matsushita, and was therefore terminated as a distributor” in or about January of 1988.
One year later the Attorney-General commenced a proceeding against Matsushita in the United States District Court for the Southern District of New York. In his District Court complaint, the Attorney-General alleged that beginning in or about January of 1988, and continuing thereafter, "defendants and their coconspirators have continually engaged in an unlawful contract, combination, or conspiracy, in unreasonable restraint of the aforesaid interstate trade and commerce, in violation of section 1 of the Sherman Act, 15 U.S.C. section § 1.” The complaint went on to allege that the conspiracy was designed "to fix, raise, maintain or stabilize the retail prices of Panasonic and/or Technics products.” Panasonic is alleged in the Attorney-General’s complaint to have directed each retailer with which it did business "to agree to charge the suggested minimum retail or 'Go’ prices” and that it told retailers that it would not continue doing business with retailers who did not adhere to this policy. The Attorney-General’s complaint asserted coercion of retailers by Matsushita to implement this price-fixing scheme.
Sixteen days after that complaint was filed Matsushita and the Attorney-General entered into a settlement agreement in which Matsushita agreed neither to demand nor require any New York distributor of Matsushita products to adhere to any of Matsushita’s retail pricing policies; required Matsushita to "pay $8.5 million into a settlement account” to satisfy claims *604 of purchasers of Matsushita products; and enjoined Panasonic for a period of five years from the date of the judgment "from entering into any contract, combination, conspiracy agreement or arrangement in violation of any federal or New York State antitrust laws with any New York retailer, dealer or distributor to fix, raise, lower, peg, maintain or stabilize the retail prices at which Panasonic or Technics products are sold to the public.” The judgment restrains Matsushita, for five years, from refusing to fill orders or discriminating in delivery, credit or other terms provided to any New York retailer for failure to adhere to any of Matsushita’s pricing policies. There are other restraints imposed as well.
The settlement agreement was approved by the District Court on January 31, 1990.
On August 31, 1989, petitioner began a civil action in the United States District Court for the Western District of New York seeking damages for Matsushita’s alleged injury to him. The complaint in that private action tracks the complaint in the Attorney-General’s action against Matsushita.
On December 11, 1989, the petitioner made a FOIL (Public Officers Law art 6) demand on the Attorney-General in which the petitioner sought, and now seeks: "(1) any documents which refer or relate in any manner to Matsushita’s suggestion of retail prices for its products, including any documents relating to Matsushita’s 'Go’ pricing policy; (2) any documents which refer or relate in any manner to compliance or noncompliance of retailers * * * with Matsushita’s retail or 'Go’ pricing policy * * * (3) any documents which refer or relate in any manner to any complaints or communications by any retailer * * * about the marketing practices, etc. * * * for Matsushita’s products * * * (4) documents received by any retailer * * * from Matsushita which refer or relate to any program or policy of Matsushita regarding the pricing of its products; (5) all documents including price lists and discount schedules which indicate the wholesale prices, dealer prices, suggested resale or 'go’ prices for items manufactured by Matsushita; (6) all documents or verified statements which will record the retail prices * * * of Matsushita products * * * sold during the period of January, 1988 to the present; (7) all documents which refer or relate in any manner to meetings at which representative of any retailer, dealer or distributor and representatives of Matsushita were present wherein matters relating to the retail pricing policy of Matsushita products was discussed including, but not limited to 'go’ *605 prices for items manufactured by Matsushita; (8) any documents relating to the termination, curtailment or cessation of any retailer, dealer or distributor as an authorized retailer, dealer or distributor for Matsushia products.” The petitioner agreed to pay all reasonable fees for copying records.
By letter dated February 8, 1980, the respondent declined to produce a single document saying "all the documents sought were received through subpoenas issued pursuant to section 343 of the General Business Law. That section provides for their confidentiality. The documents sought are, thus, exempt from public exposure pursuant to subdivision a of section 87.2 of the Public Officers Law.” The Attorney-General informed the petitioner of the latter’s right to appeal within the Attorney-General’s office. On February 14, such an appeal was submitted and on February 23, it was rejected.
Thus, the state of affairs is that not a single document or bit of information obtained by the Attorney-General in its apparent successful pursuit of Matsushita’s antitrust policies will be made available to any New York citizen who is alleged to have been damaged by those very policies.
We start with the proposition that the FOIL statute "proceeds under the premise that the public is vested with an inherent right to know and that official secrecy is anathematic to our form of government” (Matter of Fink v Lefkowitz, 47 NY2d 567, 571). Thus, all records of an agency are presumptively available for public inspection and copying, unless they fall within 1 of 8 categories of exemptions (Public Officers Law § 87 [2]; Matter of Polansky v Regan, 81 AD2d 102, 105). To give the public maximum access to records of government, these exemptions are narrowly construed (Matter of Fink v Lefkowitz, supra), and the burden of demonstrating that requested material is exempt from disclosure rests on the agency which claims exemption (Matter of Washington Post Co. v New York State Ins. Dept., 61 NY2d 557, 566). FOIL does not require that the party requesting records make any showing of need, good faith, or legitimate purpose. Full disclosure by public agencies is, under FOIL, a public right and in the public interest, irrespective of the status or need of the person making the request (see, Matter of Westchester Rockland Newspapers v Kimball, 50 NY2d 575).
Thus, in cases such as the case before us, even where the information presumably is sought for use in pending litigation, the FOIL applicant is not limited to CPLR article 31 *606 procedures and limitations (Matter of Farbman & Sons v New York City Health & Hosps. Corp., 62 NY2d 75, 81; Cornell Univ. v City of New York Police Dept., 153 AD2d 515, 516; Matter of Moore v Santucci, 151 AD2d 677, 678) but such a litigant may have the benefits, as any other citizen, of the Freedom of Information Law.
On oral argument the Attorney-General identified five grounds for its refusal to honor the petitioner’s request: (1) that the matters sought are "trade secrets or other economically sensitive information”; (2) they involved internal memoranda of the Attorney-General; (3) that the materials demanded are law enforcement materials (Public Officers Law § 87 [2] [e]); (4) that the material is exempt by statute (General Business Law § 343); and (5) that it is exempt by common-law executive privilege. The Attorney-General on argument identified the objection raised under General Business Law § 343 to be the "primary” reason for the Attorney-General’s refusal to disclose.
The Attorney-General argues that the product of his investigation is "specifically exempted from disclosure by state * * * statute” (Public Officers Law § 87 [2] [a]); and asserts that the exempting statute is section 343 of the General Business Law. Section 343, which occupies two full pages of print, invests the Attorney-General with broad powers to investigate "monopolies” (Donnelly Act, General Business Law art 22); and at its very end provides: "Any officer participating in such inquiry and any person examined as a witness upon such inquiry who shall disclose to any person other than the attorney general the name of any witness examined or any other information obtained upon such inquiry, except as so directed by the attorney general shall be guilty of a misdemeanor. Such inquiry may upon written authorization of the attorney general be made public” (emphasis supplied).
There is nothing in this statute which bars the Attorney-General from disclosing the requested information. The statute is express in imposing confidentiality on the Attorney-General’s staff prohibiting unauthorized disclosure. Clearly, the intent of this portion of the statute is to protect an ongoing investigation; not to evade the Freedom of Information Law. The Attorney-General, himself, is expressly authorized by the statute to reveal such information at any time during his investigation; and occasionally does by press conference or otherwise.
*607 The Attorney-General, to bolster this confidentiality claim, relies on a passing reference to the Freedom of Information Law in a footnote in Cirale v 80 Pine St. Corp. (35 NY2d 113, 117, n 1), a case involving disclosure under CPLR article 31. There the court spoke of a "common-law privilege” attaching to " 'confidential communications between public officers, and to public officers, in the performance of their duties, where the public interest requires that such confidential communications or the sources should not be divulged.’ ” (Supra, at 117.)
I find it difficult to understand the Attorney-General’s failure to discover the case of Matter of Doolan v Board of Coop. Educ. Servs. (48 NY2d 341) where the court said that "[t]he public policy concerning governmental disclosure is fixed by the Freedom of Information Law; the common-law interest privilege cannot protect from disclosure materials which that law requires to be disclosed * * * Nothing said in Cirale v 80 Pine Street Corp. (35 NY2d 113) was intended to suggest otherwise. ” (Emphasis supplied.)
There is no merit to the Attorney-General’s claim that this law (General Business Law § 343) requires him to keep evidence of a law breaker’s acts in perpetual confidence; or that this surviving relic of royal prerogative, executive privilege, in any way interdicts the Freedom of Information Law.
The Attorney-General seeks exemption of these materials as
"compiled for law enforcement purposes and which, if disclosed, would:
"i. interfere with law enforcement investigations or judicial proceedings” (Public Officers Law § 87 [2] [e]).
There is no demonstration that there is any judicial proceeding or law enforcement investigation in progress involving Matsushita. The Attorney-General’s action against Matsushita has resulted in a judgment. The judicial proceeding and the investigation are over. That the injunction contained in the judgment has several years to run and might at some time be violated is hardly an assertion, much less evidence, that a law enforcement investigation is going on which would be interfered with by disclosure of evidence of Matsushita’s past antitrust activity in this State. That something might occur in the future is a "wholly speculative proposition” (Church of Scientology v State of New York, 61 AD2d 942, 943). No allegation is made that by revealing the demanded information investigative techniques would be disclosed.
The Attorney-General resists disclosure on the ground that *608 the documents sought are "trade secrets or other economically sensitive information.” Presumably, he has reference to Public Officers Law § 87 (2) (d). The Assistant Attorney-General’s opposing affidavit has a single relevant sentence: "The Bureau’s records in Matsushita contain economically sensitive information pertaining to Matsushita’s pricing policies and its distributors.” Who Matsushita’s distributors are in this State, at least its retail distributors, is information readily available. A visit to any electronics dealer will promptly reveal whether Panasonic or Technics products are sold. As to its "pricing policies,” the petitioner is not seeking to determine Matsushita’s costs (cf., Matter of Belth v Insurance Dept., 95 Misc 2d 18, 20) or even how it arrives at the prices it charges. What petitioner seeks is evidence of the "Go” pricing policy, that is, the uniformity of retail sales prices it allegedly sought to impose on its distributors; what it seeks are documents relating to compliance or noncompliance with this "Go” policy, complaints from other dealers about it and the like. Most significantly, the Attorney-General does not allege that cost-to-produce figures are even in his possession.
Like much of the remainder of the defense, all we have is a general statement about "economically sensitive information.” We are provided with no information by the Attorney-General which even hints at the nature of this information.
The Attorney-General asserts that "[m]any witnesses and entities request that their names and the information they provide be kept confidential thereafter.” He does not allege that any such request was made by any "witness or entity” in this case.
The Attorney-General says that "[t]his Bureau has consistently assured witnesses and entities that such information will be kept confidential.” Unlike Hawkins v Kurlander (98 AD2d 14, 17) he alleges no such assurance to any "witness or entity” in this case.
The Attorney-General, for what may be good and sufficient reason "often agrees to treat as confidential information supplied by the target itself;” but does not allege he did so in this case.
That future prospective witnesses might be discouraged from cooperating with the Attorney-General in the face of promises not kept is quite irrelevant; for no promises have been alleged making such a speculation a matter of no consideration in this case.
*609 Least comprehensible, in this case, is the allegation that "[maintaining the confidentiality of the investigatory file also serves to protect the reputation of the innocent investigated entity, which may be harmed by the adverse publicity of a pending or past investigation even if it committed no violation.” There is more than probable cause to believe, under the circumstances of this case, that we are not dealing with a company which "committed no violations;” but a law breaker seeking to impose its controls on American businessmen.
As to the Attorney-General’s complaint that petitioner seeks his internal memoranda, I discern no such demand and such memoranda need not be made available.
Finally, we come to the question of procedure. The preferred method is for the court "to conduct an in camera inspection of documents requested under FOIL and to redact confidential information” (Cornell Univ. v City of New York Police Dept., 153 AD2d, supra, at 516); but where, as here, there are no "specifics presented either in the moving papers or on oral argument that support the conclusion that an in camera inspection of the individual papers would be helpful on this issue” (Church of Scientology v State of New York, 61 AD2d 942, 943, supra), such inspection is unnecessary and may be dispensed with.
The petition is granted.