OPINION OF THE COURT
Chief Judge Cooke.
Petitioner commenced this proceeding to compel release of the office manual of the Deputy Attorney-General and Special Prosecutor for Nursing Homes pursuant to the Freedom of Information Law (Public Officers Law, art 6). The issue posed is whether certain portions of the manual that reveal confidential methods used for investigating nursing home fraud are exempt from disclosure pursuant to section 87 (subd 2, par [e], cl iv) of the Public Officers Law.
In 1974, amid widespread reports of patient abuse, Medicaid fraud and inadequate governmental supervision of the nursing home industry in the State, the Commissioners of the Departments of Health and Social Services requested the Attorney-General to investigate and prosecute offenses committed in connection with the operation of these health care facilities. Early the following year, Charles J. Hynes was appointed Deputy Attorney-General and Special Prosecutor to lead this investigation into "the rampant corruption in nursing homes” (Matter of Hynes v Moskowitz, 44 NY2d 383, 396). Subsequently, on February 7, 1975, the Governor promulgated an executive order (9 NYCRR 3.4) pursuant to subdivision 8 of section 63 of the Executive Law significantly expanding the jurisdiction of the Special Prosecutor, directing him to investigate "criminal violations committed in connection with or in any way related to the management, control, operation, or funding of any nursing home” (see Matter of Sigety v Hynes, 38 NY2d 260, 263-265, cert den 425 US 974).
Shortly after taking office, the Special Prosecutor compiled a comprehensive office manual entitled "Materials on the Nursing Home Investigation” for the use of his staff. The first three chapters of the manual provided an overview of the nursing home industry, chronicling past abuses which necessitated creation of the office of the Special Prosecutor and explaining the Medicaid reimbursement system. Chapter IV contained a step-by-step guide to an investigation and audit of *570 a nursing home, including specific illustrations of some of the techniques and procedures which had proven successful in detecting nursing home fraud. The final chapter contained a "sample nursing home investigation”, featuring the audit and investigative reports that had lead to a successful prosecution by the Deputy Attorney-General.
On February 11, 1977, petitioner, an attorney for several nursing homes, requested a copy of the manual pursuant to the former version of the Freedom of Information Law (L 1974, chs 578-580). Upon refusal of respondent to disclose the manual, this article 78 proceeding was commenced. Special Term conducted an in camera inspection of the documents and found them to be within the definition, of disclosable "administrative staff manuals and instructions to staff that affect members of the public” provided by former section 88 (subd 1, par e) of the Public Officers Law. In so holding, the court rejected respondent’s assertion that the manual was exempt from disclosure as "part of investigatory files compiled for law enforcement purposes” (former Public Officers Law, § 88, subd 7, par d [L 1974, ch 579, § 3]).
While respondent’s appeal was pending before the Appellate Division, there occurred a number of developments which significantly altered the posture of the case. Although the order of Special Term had been statutorily stayed pending appeal (CPLR 5519, subd [a], par 1), respondent voluntarily disclosed the first three chapters of the manual as well as substantial portions of chapter IV. In addition, petitioner was informed that the manual had been revised and was furnished with the new pages corresponding to those materials previously disclosed. Most significant, effective January 1, 1978, the Legislature re-enacted the Freedom of Information Law (L 1977, ch 933), clarifying what were perceived to be troublesome areas in the prior law. Both sides agree that the current version of the statute governs resolution of the questions presented on this appeal.
The Appellate Division modified the order of Special Term, concluding that chapter V of the manual and the still undisclosed portions of chapter IV were exempt from disclosure (63 AD2d 569, 571). Both sides appealed to this court: petitioner as of right (CPLR 5601, subd [a]); respondent, seeking to withhold an additional four and one-half pages of chapter IV ordered disclosed by the Appellate Division, by permission of that court (CPLR 5602, subd [a], par 1, cl [i]).
*571 Crucial to the determination of this case is an appreciation of the function of the documents petitioner seeks in the context of the purpose and operation of the Freedom of Information Law. That act, of course, proceeds under the premise that the public is vested with an inherent right to know and that official secrecy is anathematic to our form of government. Thus, the statute affords the public the means to attain information concerning the day-to-day operations of State government. By permitting access to official information long shielded from public view, the act permits the electorate to have sufficient information in order to make intelligent, informed choices with respect to both the direction and scope of governmental activities (see Public Officers Law, § 84). Moreover, judicious use of the provisions of the law can be a remarkably effective device in exposing waste, negligence and abuses on the part of government; in short, "to hold the governors accountable to the governed” (NLRB v Robbins Tire & Rubber Co., 437 US 214, 242).
But while the Legislature established a general policy of disclosure by enacting the Freedom of Information Law, it nevertheless recognized a legitimate need on the part of government to keep some matters confidential. To be sure, the balance is presumptively struck in favor of disclosure, but in eight specific, narrowly constructed instances where the governmental agency convincingly demonstrates its need, disclosure will not be ordered (Public Officers Law, § 87, subd 2). Thus, the agency does not have carte blanche to withhold any information it pleases. Rather it is required to articulate particularized and specific justification and, if necessary, submit the requested materials to the court for in camera inspection, to exempt its records from disclosure (see Church of Scientology of N. Y. v State of New York, 46 NY2d 906, 908). Only where the material requested falls squarely within the ambit of one of these statutory exemptions may disclosure be withheld.
Respondent seeks to avoid disclosure of portions of its office manual, claiming that it has the right to "deny access to records or portions thereof that: * * * are compiled for law enforcement purposes and which, if disclosed, would: * * * reveal criminal investigative techniques or procedures, except routine techniques and procedures” (Public Officers Law, § 87, *572 subd. 2, par [e], cl iv).* The purpose of this exemption is obvious. Effective law enforcement demands that violators of the law not be apprised of the nonroutine procedures by which an agency obtains its information (see Frankel v Securities & Exch. Comm., 460 F2d 813, 817, cert den 409 US 889). However beneficial its thrust, the purpose of the Freedom of Information Law is not to enable persons to use agency records to frustrate pending or threatened investigations nor to use that information to construct a defense to impede a prosecution.
To be distinguished from agency records compiled for law enforcement purposes which illustrate investigative techniques, are those which articulate the agency’s understanding of the rules and regulations it is empowered to enforce. Records drafted by the body charged with enforcement of a statute which merely clarify procedural or substantive law must be disclosed. Such information in the hands of the public does not impede effective law enforcement. On the contrary, such knowledge actually encourages voluntary compliance with the law by detailing the standards with which a person is expected to comply, thus allowing him to conform his conduct to those requirements (see Stokes v Brennan, 476 F2d 699, 702; Hawkes v Internal Revenue Serv., 467 F2d 787, 794-795; Davis, Administrative Law [1970 Supp], § 3A, p 114).
Indicative, but not necessarily dispositive, of whether investigative techniques are nonroutine is whether disclosure of those procedures would give rise to a substantial likelihood that violators could evade detection by deliberately tailoring their conduct in anticipation of avenues of inquiry to be pursued by agency personnel (see Cox v United States Dept. of Justice, 576 F2d 1302, 1307-1308; City of Concord v Ambrose, 333 F Supp 958). It is no secret that numbers on a balance sheet can be made to do magical things by those so inclined. Disclosing to unscrupulous nursing home operators the path that an audit is likely to take and alerting them to items to which investigators are instructed to pay particular attention, does not encourage observance of the law. Rather, release of such information actually countenances fraud by enabling *573 miscreants to alter their books and activities to minimize the possibility of being brought to task for criminal activities. In such a case, the procedures contained in an administrative manual are, in a very real sense, compilations of investigative techniques exempt from disclosure. The Freedom of Information Law was not enacted to furnish the safecracker with the combination to the safe.
Tested by these criteria, and after an in camera inspection of the documents withheld by respondent, we find that the information petitioner seeks on its direct appeal should not be disclosed. Chapter V of the Special Prosecutor’s manual provides a graphic illustration of the confidential techniques used in a successful nursing home prosecution. None of those procedures are "routine” in the sense of fingerprinting or ballistic tests (see Senate Report No. 93-1200, 93 Cong 2d Sess [1974]). Rather, they constitute detailed, specialized methods of conducting an investigation into the activities of a specialized industry in which voluntary compliance with the law has been less than exemplary. Similarly, the portions of chapter IV of the manual ordered withheld by the Appellate Division pinpoint numerous factors which should alert an investigator that something is awry. To permit disclosure of these time-tested techniques which have led to numerous successful prosecutions would have a dramatic impact on law enforcement investigations by alerting prospective defendants to the course those inquiries would be likely to take. An unscrupulous nursing home operator aware of these factors would naturally try to channel irregularities into other avenues or erect obstacles in the path of investigation.
These same considerations apply with equal force to page 305 and the last item on page 336 and page 337 of the manual, which are the subject of respondent’s cross appeal. Disclosure of the techniques enumerated in those pages would enable an operator to tailor his activities in such a way as to significantly diminish the likelihood of a successful prosecution. The information detailed on pages 481 and 482 of the manual, on the other hand, is merely a recitation of the obvious: that auditors should pay particular attention to requests by nursing homes for Medicaid reimbursement rate increases based upon projected increases in cost. As this is simply a routine technique that would be used in any audit, there is no reason why these pages should not be disclosed.
Accordingly, the order of the Appellate Division should be *574 modified, with costs to respondent, by affirming so much of that order encompassed by petitioner’s appeal, and reversing so much of that order as directed respondent to disclose page 305 and the last item on page 336 and page 337 of the office manual of the Deputy Attorney-General and Special Prosecutor for Nursing Homes.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Meyer concur.
Order modified, with costs to the respondent, in accordance with the opinion herein and, as so modified, affirmed.

 The legislative history of the Freedom of Information Law indicates that many of its provisions, including the exemption at issue here, were patterned after the Federal analogue (US Code, tit 5, § 552, subd [b], par [7], cl [E]; see letters of Senators Anderson and Marino, Governor’s Bill Jacket to S 16-A). Accordingly, Federal case law and legislative history on the scope of this exemption are instructive.