OPINION OF THE COURT
Hilda G. Schwartz, J.
Calendar Nos. 211 and 223 are consolidated for disposition.
Calendar No. 211 is a petition by the American Broadcasting Companies, Inc. (ABC), pursuant to CPLR article 78 for access to certain information pursuant to the Freedom of Information Law ([FOIL], Public Officers Law, §§ 84-90) and the rules and regulations promulgated by the State of New York Banking Department thereunder (3 NYCRR 106.1-106.6 [Supervisory Procedure G 106]).
Calendar No. 233 is a motion by the Check Cashers Association of New York, Inc., to intervene as a party respondent in this proceeding, pursuant to CPLR 1012 (subd [a]) and/or CPLR 1013.
ABC’s news division, ABC News, seeks access to certain limited information contained on approved license applica *745 tions submitted to the Banking Department by 20 check-cashing licensees. Specifically, ABC News seeks the names, addresses and aliases of the directors, stockholders and officers of these check-cashing licensees as well as of other persons having an interest in these check-cashing licensees, to all of whom ABC News has collectively referred as “the principals” of the check-cashing licensees.
ABC News gathers news and disseminates same through television news reports and documentaries broadcast over ABC’s television network. It states it will begin filming and editing a documentary for inclusion in its weekly “20/20” network news program, scheduled to be broadcast on or about September 3,1981 and that this information is necessary in connection therewith. On or about March 20, 1981 ABC News submitted its request to the Banking Department on the form provided by the department for persons seeking access to its records.
ABC News requested (a) the information provided to the Banking Department by 20 designated licensees on their “Application for License as Licensed Casher of Checks” and (b) any complaints or information from hearings in the Banking Department’s possession relating to the 20 designated licensees. The license applications consisted of 22 questions and ABC News sought the answers supplied to all of these questions by each of the 20 designated licensees.
The Banking Department, in response, provided the requested license applications to ABC, but the answers to all but 7 of the 22 questions were expunged by the Banking Department. Among the information deleted were the names, addresses and aliases of the principals of the 20 designated check-cashing licensees; and complaints or information from hearings relating to them. Subsequently the Superintendent of the Banking Department (Superintendent) provided ABC News with some information and documentation as to complaints relating to some of the 20 designated check-cashing licensees. However, it refused access to the information pertaining to the names, addresses and aliases of the principals of the 20 designated check-cashing licensees (i.e., the answers to questions 12, 13, 14, 21 and 22 of the license applications) upon the *746 ground that it is exempt from disclosure in that release of the information would endanger the lives or safety of certain persons (Public Officers Law, § 87, subd 2, par [f]) and upon the ground that disclosure would constitute an unwarranted invasion of personal privacy (Public Officers Law, § 89, subd 2, par [b], cl i).
On this motion, petitioner ABC News limits its request to the names and other names by which known, addresses including residence addresses of principals and others who have an interest in the business. Respondent Superintendent maintains this information is exempt from disclosure. The questions to which petitioner seeks access to the answers are:
“12. Has any person other than those listed herein any interest, direct or indirect, in the business to be licensed? If so, give name and address of each:
“13. Has.any officer, director or substantial stockholder ever been known by any other name than that now used?
“14. If so, give details and attach certified copy of court order, if any, effecting such change:
“21. Names and addresses of Directors and Stockholders.
“22. The names and residences of each of the Officers of the corporation are as follows:”.
The general counsel of Check Cashers Association of New York, Inc., proposed intervenor, in describing the industry states it was first licensed in the State of New York in 1947; that it serves a banking function in those areas and to those segments of the general public who do not maintain commercial or savings bank accounts; that of necessity the business of licensed check cashers involves the use of currency and negotiable paper such as food stamps. He states that as such, they are and have been over the years, the subject of robberies, kidnappings and murders; that the individual licensed check-cashing locations have for many years installed protection such as bullet-proof glass partitions, silent alarms wired to central locations; electric eye and sonar protection. All locations have steel double door protection. He asserts that while the average check-cashing location is not readily vulnerable to holdup or robbery, licensed check cashers are most vulner *747 able when outside their protected areas, such as on the way from or to their homes. In recent years, they have become the subject of threats of kidnapping to themselves and to members of their families. It is pointed out that in the last year alone, in excess of 50 violence-related crimes were perpetrated against the check-cashing industries. A list of 17 recent crimes is submitted, including 12 armed robberies, 2 robberies and 3 kidnap and armed robberies, in which the sums involved ranged from $8,000 to $150,000. An instance of a kidnap of a daughter and an attempted robbery at the home of a check casher is described and emphasis placed on the dangers of making residence locations public knowledge.
The Superintendent calls attention to another incident of a kidnapping-robbery type of crime occurring last year, when the employee of a check-cashing business was accosted at gunpoint outside his home, accompanied to the store and forced to hand over in excess of $25,000. This employee was accosted at gunpoint again, five months later although he had moved his residence, in the lobby of his apartment building, driven to the store and forced to hand over in excess of $40,000, suffering, in addition, bodily injuries.
The Superintendent concedes that the risk of robberies inherently exists in the check-cashing business and that violent crimes can occur even without the disclosure of the information sought. The Superintendent contends, however, that the basis for her refusal is that it would significantly increase the risk of danger which already exists.
In invoking the exemption in the Freedom of Information Law which provides that a State agency may deny access to its records or portions thereof which, if disclosed, would endanger the life or safety of any person (Public Officers Law, § 87, subd 2, par [f]), the Superintendent stated in her letter dated April 29,1981: “Check cashing is a business in which large amounts of cash are available. Revealing the names and addresses of those individuals [the principals of the 20 designated check-cashing licensees] could significantly increase the risk of robberies which could endanger the lives and safety of the persons involved.”
*748 The respondent points out that the majority of the check-cashing businesses are small storefront concerns, often located in areas with high crime rates. Large amounts of cash and food stamps must be kept on the premises. Respondent argues that while the business locations are vulnerable to robbery, most often armed robbery, the release of the names and addresses of the principals will facilitate the type of crime wherein a robber holds the owner, a member of his family or an employee as ransom for the cash kept at the business premises. Respondent concedes that the risk of on-premises robbery already exists. Its objection to disclosure is that it will substantially increase the risk of kidnapping-hostage-ransom-type crime. Knowledge of the residence addresses of principals and their families would facilitate this type of serious crime in which life as well as property was imperiled.
The issue here is whether the specific information requested, to wit: the names and addresses, including the residence addresses of the principals of check-cashing businesses, should be made available for public information or whether it or any part of it may be withheld by the agency as falling within the ambit of one of the statutory exemptions.
For the answer to this question, we must go to the Freedom of Information Law (Public Officers Law, § 84 et seq.).
Section 87 (subd 2, par [f]) of the Public Officers Law provides:
“2. Each agency shall, in accordance with its published rules, make available for public inspection and copying all records, except that such agency may deny access to records or portions thereof that * * *
“(f) if disclosed would endanger the life or safety of any person”.
The Freedom of Information Law must be liberally construed to allow maximum access to governmental records. Statutory exemptions are narrowly construed (Matter of Miracle Mile Assoc. v Yudelson, 68 AD2d 176, 181, mot for lv to app den 48 NY2d 706). Disclosure may be withheld only where the material requested is clearly within the exemption provided in the statute.
*749 The FOIL was enacted to enhance, to the fullest permissible extent the access of the public and the news media to records and information in the possession of State and local governmental agencies. The courts of this State have generally construed the FOIL liberally (Matter of Westchester Rockland Newspapers v Kimball, 50 NY2d 575; Matter of New York Teachers Pension Assn. v Teachers’ Retirement System of City of N.Y., 71 AD2d 250; Matter of Dunlea v Goldmark, 54 AD2d 446, affd 43 NY2d 754; Matter of Herald Co. v School Dist. of City of Syracuse, 104 Misc 2d 1041; Matter of Gannett News Serv. v State of New York Off. of Alcoholism & Substance Abuse, Div. of Substance Abuse Servs., 99 Misc 2d 235).
In enacting the FOIL, the Legislature declared its purpose to reveal the process of governmental decision making to public scrutiny. It stated (Public Officers Law, §84): “The people’s right to know the process of governmental decision-making and to review the documents and statistics leading to determinations is basic to our society. Access to such information should not be thwarted by shrouding it with the cloak of secrecy or confidentiality.”
In Matter of Fink v Lefkowitz (47 NY2d 567) in which an individual sought the release of the office manual of the Special Prosecutor for Nursing Homes in which certain portions revealed confidential methods of investigation, the Court of Appeals withheld disclosure of certain confidential techniques used in a nursing home prosecution while allowing disclosure of other, routine techniques and procedures, under the exemption in section 87 (subd 2, par [e], cl iv) of the Public Officers Law. The court stated (p 571): “But while the Legislature established a general policy of disclosure by enacting the Freedom of Information Law, it nevertheless recognized a legitimate need on the part of government to keep some matters confidential. To be sure, the balance is presumptively struck in favor of disclosure, but in eight specific, narrowly constructed instances where the governmental agency convincingly demonstrates its need, disclosure will not be ordered”.
Respondent argues that revealing the identities of the principals of check-cashing licensees would be an invasion of their personal privacy (Public Officers Law, § 89, subd 2, *750 par [b], cl i). With the possible exception of their home addresses, it would not. After all, the applicants sought, by license, the patronage of the public-at-large. In supplying this information to the agency, the licensees’ reasonable expectation probably was that this information would be available to the public. Nor is there any indication by rule or otherwise that the applicants had any expectation or had received any assurance that this information as to their principals would be shrouded from disclosure.
In order to maintain a business whose primary function is to cash checks, a license must be obtained pursuant to sections 366 through 374 of article 9-A of the Banking Law. These require a completed application containing 22 items. In response to petitioner’s request for access to the answers on 20 applications and disclosure of any complaints, the respondent provided to petitioner partial copies of the license applications requested, expunging the answers to all but 7 of the 22 questions.
However, in this proceeding, petitioner seeks access only to the answers to questions 12,13,14, 21 and 22 relating to the names, residence addresses and other names by which known. It does not seek access to the answers to the 10 other questions withheld.
Obviously, the risk of robberies and thefts inherently exists in the check-cashing business. Just as obvious is the fact that the type of kidnapping-robbery described can occur even without the disclosure of the information sought. The criminal, intent on robbery, does not require the name of the individual who, he observes at the business location, may be in possession of cash.
However, the home address or residence location of the principals presents another question.
The answers to the other questions would adequately identify and provide the names and office addresses of officers, directors, stockholders and other persons interested directly or indirectly in the business. The additional request for the home address of each of these, while not essential to establishing identity, creates a serious risk that the information may be used for criminal purposes.
While there are benefits to be gained from the disclosure of all the answers to approved applications for check- *751 cashing businesses, these benefits do not outweigh the concomitant dangers attached to disclosing the location of the homes and families of the principals of those businesses.
In the recent case of Matter of Kwitny v McGuire (53 NY2d 968, affg 77 AD2d 839, affg 102 Misc 2d 124) the Court of Appeals held (Meyer, Jasen and Fuchsberg, JJ., dissenting) in a petition to compel access to approved pistol license applications on file with the New York City Police Department, that access to the records be granted. The Police Commissioner had resisted the disclosure on the basis of violation of applicants’ rights of privacy and that life or safety would be endangered. The Court of Appeals majority rejected the dissenting opinion in the Appellate Division as well as the dissent in the Appeals Court. In Kwitny, the dissent points out that applications for a pistol permit often include data when cash or other valuables are transported by the licensee and that this information is not included in subdivision 5 of section 400 of the Penal Law which specifically provides that an application for a pistol license “shall be a public record.” The Kwitny holding is distinguishable from the case at bar in that Kwitny turned on subdivision 5 of section 400 of the Penal Law. Here, the answer must be sought in the Freedom of Information Law.
Under FOIL, the public has a right of access to the names and business addresses of principals of applicants for license to operate a check-cashing business, which seeks public patronage. If known by other names, that should also be disclosed. However, disclosure of their home or residence addresses could, in the nature of the business they conduct, expose applicants and their families to danger to life or safety and should be withheld.
The motion of the proposed intervenor for leave to intervene is granted.
The petition is granted to the extent of directing the respondent to disclose to the petitioner the answers provided by the 20 designated check-cashing licensees to the submitted questions 12, 13, 14, 21 and 22 except for the residence addresses of the individuals named, which resi *752 ence addresses shall be withheld pursuant to section 87 (subd 2, par [f]) of the Public Officers Law.