*322 OPINION OF THE COURT
Evelyn Frazee, J.
In March 1993, Gannett Co., Inc. (Gannett) filed a request with the County of Monroe (County) pursuant to the New York Freedom of Information Law (Public Officers Law art 6 [FOIL]) for "records indicating the nature of an incident or disturbance [at the Monroe County Jail] that led to a number of inmates being removed from the general population around midnight on April 26, 1992 and handcuffed to cell bars.” Gannett’s request was initially denied by the County on the basis that "the material requested is not disclosable as the incident is under investigation, pursuant to section 87 (2) (e) (i) of the Public Officers Law.”
Gannett appealed to the Appeals Officer for the County asserting that the blanket refusal to disclose any information was inappropriate. Gannett argued that the County could redact portions of documents which, in fact, might interfere with any investigation of the matter and disclose the remainder of the documents. The Appeals Officer denied Gannett’s appeal on the basis that the records were exempt from disclosure pursuant to Public Officers Law § 87 (2) (e) (i) because disciplinary proceedings remain open and because the records were pertinent to evaluate the performance of the employees involved, and, therefore, were exempt from disclosure pursuant to Public Officers Law § 87 (2) (a) and Civil Rights Law § 50-a.
Thereafter, Gannett commenced this CPLR article 78 proceeding for an order permitting it to inspect or copy the records involving the April 26, 1992 jail incident. The County answered, asserting as affirmative defenses that the records sought are exempt from disclosure pursuant to (1) Public Officers Law § 87 (2) (a) and Civil Rights Law § 50-a, (2) Public Officers Law § 82 (2) (e) (i), and (3) Public Officers Law § 87 (2) (g).
DISCUSSION
The investigation and resultant report sought by Gannett have been described in affidavits of Monroe County Sheriff Andrew P. Meloni (Meloni) and Monroe County Sheriff Deputy Lieutenant Maureen W. Chisholm (Chisholm) submitted by the County. The affidavits state that on or about April 30, 1992, Meloni learned of allegations regarding inmates, one of whom was apparently represented by the Monroe County *323 Public Defender, being handcuffed to jail bars on or about April 27, 1992. He ordered an investigation by the Sheriff’s Internal Affairs Department. This investigation was conducted by Chisholm and Sergeant Daniel Nichols and a report was submitted to Meloni. [1]Meloni asserts that the investigation was conducted to determine the facts surrounding the incident to aid him in assessing whether disciplinary or other action should be taken against any Sheriff’s deputies and to evaluate whether modification of jail practices and procedures was warranted. Meloni further states that as a result of the investigation, disciplinary action was brought against two deputies and those proceedings remain pending. According to Meloni, the only materials or documents generated by the Sheriff’s Department are those pertaining to the investigation conducted by Internal Affairs and the report which they prepared.[2]
Plaintiff asserts that the purpose of FOIL — to promote public access to governmental functions — will be served by granting its request to review the records sought. Gannett further contends that the County has not demonstrated an exemption to disclosure under FOIL.
FOIL imposes a broad standard of disclosure upon the State and its agencies (see, Matter of Farbman & Sons v New York City Health & Hosps. Corp., 62 NY2d 75, 79 [1984]). FOIL is to be liberally construed and all records of a public agency are *324 presumptively open to public inspection unless otherwise specifically exempted (see, Matter of Farbman & Sons v New York City Health & Hosps. Corp., supra, at 79-80). The exemptions are to be narrowly interpreted in order to grant the public maximum access to government records (see, Matter of Capital Newspapers v Whalen, 69 NY2d 246, 252 [1987]). The burden is on the governmental agency to demonstrate that the requested material falls squarely within a statutory exemption by articulating a particularized and specific justification for denying access (see, Matter of Capital Newspapers v Burns, 67 NY2d 562, 566 [1986]; Matter of Fink v Lefkowitz, 47 NY2d 567, 571 [1979]).
PUBLIC OFFICERS LAW § 87 (2) (a) AND CIVIL RIGHTS LAW § 50-a
The County, relying heavily on the Court of Appeals decision in Matter of Prisoners’ Legal Servs. v New York State Dept. of Correctional Servs. (73 NY2d 26 [1988]), argues that the material requested is exempt from disclosure pursuant to Public Officers Law § 87 (2) (a) and Civil Rights Law § 50-a.[3]
In Prisoners’ Legal Servs. (supra), the Court of Appeals held that inmate grievances against State correction officers and the administrative decisions relating thereto constitute personnel records used to evaluate performance toward continued employment or promotion under Civil Rights Law § 50-a (1) and were exempt from disclosure under Public Officers Law § 87 (2) (a). The question presented in Prisoners’ Legal Servs. (supra) was viewed by the Court to be one involving the meaning of personnel records under Civil Rights Law § 50-a (1) rather than one involving the interpretation of FOIL (supra, at 30). Two criteria that the records must meet in order to constitute "personnel records” under section 50-a (1) of the Civil Rights Law were recognized, to wit: the records *325 must (1) be under the control of the particular agency or department, and (2) be used to evaluate performance toward employment or promotion (supra, at 31). The Court also noted that the legislative purpose underlying section 50-a of the Civil Rights Law was to protect officers from the use of records as a means for harassment and reprisals and for purposes of cross-examination by plaintiffs counsel during litigation (supra, at 31-32). The argument that the exemption does not apply if the records are not physically maintained as part of the officers’ employment records or in their personnel files was rejected (supra, at 32). The Court also rejected the argument that section 50-a of the Civil Rights Law was intended to afford protection only after a particular grievance had been subject to litigation (supra, at 32-33).
Additionally, the Court indicated that the reference to disclosure by "lawful court order” under section 50-a (1) of the Civil Rights Law must be read in conjunction with section 50-a (3) (supra, at 33). Section 50-a (3) of the Civil Rights Law provides that if after a hearing and in camera inspection it appears to the reviewing Judge that "the records are relevant and material in the action before him,” he may issue an order releasing them. The Court stated that there "can be no question that the statute thus permits court-ordered disclosure of personnel records within its protection — i.e., those that have potential use in harassing and embarrassing officers in litigation — only in the context of an ongoing litigation” (supra, at 33).
The highest Court’s decision in Prisoners’ Legal Servs. (73 NY2d 26, supra) was distinguished from that in Matter of Capital Newspapers v Bums (67 NY2d 562, supra). In Capital Newspapers v Burns (supra), a newspaper reporter was permitted FOIL access to a police officer’s attendance and sick leave records. The Court distinguished the two cases on the basis that the materials requested in Capital Newspapers v Burns "were sought for a purpose and in a context that could have had no relation to potential litigation” (Matter of Prisoners’ Legal Servs. v New York State Dept. of Correctional Servs., supra, at 33). The Court went on to explain that in Capital Newspapers v Burns (supra) it: "simply recognized that the legislative intent in enacting the 1981 amendment to section 50-a [to cover correction officers as well as police officers, as originally enacted] was to prevent release of sensitive personnel records that could be used in litigation for the purpose of harassing or embarrassing correction officers (see, 67 NY2d, at *326 568-569, supra); records having remote or no such potential use, like those sought in Capital Newspapers, fall outside the scope of the statute” (Matter of Prisoners’ Legal Servs. v New York State Dept. of Correctional Servs., supra, at 33).
This distinction and the determination as to whether records being sought could be used in potential litigation is often illusory and not easily applied. The problem facing this court was succinctly set forth by Judge Titone in his dissenting opinion in Prisoners’ Legal Servs. (supra, at 37): "First, the majority has provided no guidance as to how the lower courts may distinguish between disclosure requests with no relation to litigation of any kind and those which are potentially related to some future, yet-to-be identified litigation. Apart from sheer speculation and assumptions based upon the applicant’s identity, no solution to this problem is readily apparent. Indeed, the majority in this case has not explained its basis for distinguishing between the information request in this case and that made in Capital Newspapers, and the only distinction that suggests itself is that urged by respondents: i.e., that the request in Capital Newspapers was made by a news media applicant, while the request in this case was made by a legal advocacy organization specializing in prisoners’ rights.”
Gannett states that it is not involved in nor does it contemplate commencing litigation against any of the correction officers who may have participated in the incident. Therefore, Gannett argues that it is entitled to the records requested under the holding in Capital Newspapers v Burns (supra).
The question left for determination by this court, in light of Prisoners’ Legal Servs. (supra), is whether or not plaintiff’s stated intention that the information is not requested in furtherance of litigation is sufficient to grant it access to the records. It is this court’s interpretation that under Prisoners’ Legal Servs. (supra) and Capital Newspapers v Burns (supra), the analysis of whether the documents could be used against the ofiicer(s) does not depend solely upon the applicant’s identity as a litigant or potential litigant. For example, a nonlitigating newspaper was denied access to internal affairs documents, including complaints and records compiled by the police department in investigating the complaints, because the documents were viewed as personnel records within the meaning of section 50-a of the Civil Rights Law in Matter of Gannett Co. v James (108 Misc 2d 862 [Sup Ct, Monroe County *327 1981], affd 86 AD2d 744 [4th Dept 1981], lv denied 56 NY2d 502 [1982]).
Consideration must also be given to the type of incident involved (i.e., whether it has or is likely to result in litigation) and the potential that disclosure to an actual or potential litigant or to a third party may harass, embarrass or otherwise be adversely used against the officer(s). Where the records sought involve an investigation of alleged misconduct by an officer against an inmate, as distinguished from an investigation of the officer’s time and leave records, the possibility of litigation cannot be said to be remote. Disclosure of the personnel records to a news media applicant would likely result in publication of such records to the general public. In addition, a litigant conceivably could seek to obtain from the news media or other third-party applicant disclosure of all information obtained by them. Disclosure of personnel records under such circumstances has the potential to be adversely used against the officer(s).
Gannett further asserts that Civil Rights Law § 50-a does not prevent disclosure because it seeks factual information only and will accept records with the names or other identifying features of individuals redacted. While limited disclosure of factual information and the redaction of names has some initial appeal, further analysis indicates that such an order is not appropriate in this case. First, if the Legislature had intended that personnel records, otherwise exempt under Civil Rights Law § 50-a, could be obtained by simply redacting the names or other identifying features of the individuals, it would have so provided in the statute. Common sense indicates that simply redacting names might not be sufficient to protect the confidentiality of the records otherwise exempt under Civil Rights Law § 50-a. Second, it is self-evident that any investigation used to evaluate performance will contain factual as well as nonfactual materials (cf, Public Officers Law § 87 [2] [g]). Section 50-a of the Civil Rights Law does not make any distinction between disclosure of factual and nonfactual materials. Also, the Court of Appeals in Prisoners’ Legal Servs. (supra) did not indicate that factual information in records used to evaluate performance could be obtained while purely nonfactual information could not.
Turning to the instant proceeding, the County has met its burden of proving that their internal investigation and report constitute "personnel” records within the meaning of section 50-a of the Civil Rights Law and are exempt from disclosure *328 under FOIL (Public Officers Law § 87 [2] [a]; Matter of Prisoners’ Legal Servs. v New York State Dept. of Correctional Servs., supra; Matter of Gannett Co. v James, supra). It cannot be said that release of these personnel records, unlike the attendance and sick leave records at issue in Capital Newspapers v Burns (supra), have remote or no potential use in litigation against the officers (see, Matter of Prisoners’ Legal Servs. v New York State Dept. of Correctional Servs., supra). Therefore, the petition is denied.
Since the court decides the matter under Civil Rights Law § 50-a, it is unnecessary to reach the other grounds asserted by the County in opposition to disclosure (see, Public Officers Law § 82 [2] [e] [i]; § 87 [2] [g]).

. According to Chisholm, the general procedure followed in an Internal Affairs investigation is to gather evidence and documentary materials, identify relevant law, regulations and departmental orders and question witnesses. Upon completion of the investigation, a report is prepared. The investigations, according to Chisholm, are confidential and any employee who does not fully cooperate may be charged with a violation of departmental regulations which could result in termination of employment.

. According to Chisholm, the specific documents which were generated are as follows:
(1) taped interview of (names withheld);
(2) photographs of cell area;
(3) infraction reports;
(4) daily duty roster;
(5) example of jail bars on street level;
(6) log book entries;
(7) copies of general orders;
(8) copies of New York State Correction Law;
(9) lesson plans;
(10) defensive tactics outline;
(11) in-service training personnel order; and
(12) form letters to (names withheld).

. Public Officers Law § 87 (2) (a) provides as follows:
"2. Each agency shall, in accordance with its published rules, make available for public inspection and copying all records, except that such agency may deny access to records or portions thereof that:
"(a) are specifically exempted from disclosure by state or federal statute.”
New York Civil Rights Law § 50-a, the applicable State statute, provides in relevant part: "1. All personnel records, used to evaluate performance toward continued employment or promotion, under the control of any police agency or department of the state or any political subdivision thereof * * * shall be considered confidential and not subject to inspection or review without the express written consent of such police officer, firefighter, firefighter/ paramedic or correction officer except as may be mandated by lawful court order.”