State of New York
Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 41
In the Matter of Bethany
Kosmider,
        Respondent,
    v.
Mark Whitney, as Commissioner
of the Essex County Board of Elections,
        Respondent,
Allison McGahay, as Commissioner
of the Essex County Board of Elections,
et al.,
        Appellants.

James E. Walsh, for appellant McGahay.
Daniel T. Manning, for appellant Preston.
Daniel R. Novack, for respondents Kosmider and Whitney.

DiFIORE, Chief Judge:

During the two years following an election, Election Law § 3-222(2) precludes

examination of "voted ballots" absent a court order or legislative committee direction.

Because electronic copies of ballots are no less protected from disclosure under section 3-

222 during the relevant time frame, we reverse the Appellate Division order affirming the judgment directing disclosure of those copies and deny the petition.

The document request giving rise to this appeal concerns the electronic voting system implemented in 2009.  Since the adoption of this system, voters going to the polls on election day each mark a standardized paper ballot, which is then scanned by an electronic voting machine.  The machine deposits the paper ballot in a secure ballot box and stores the scanned copy of the ballot and an associated electronic record of how the machine counted its votes on two removable memory cards (e.g., flash drives).  One memory card remains in the machine for use during the recanvass process, and the other is returned to the applicable board of elections for preservation of its contents – copies of the ballots that were scanned into the machine – by transfer to other electronic storage media, such as a hard drive or CD.

In December 2015, petitioner Bethany Kosmider forwarded a series of emails to the Essex County Board of Elections (County Board) requesting the electronic copies of ballots stored by County voting machines in the November 2015 general election and preserved by the County Board.  The two Commissioners of the County Board were divided regarding whether the Election Law permitted release of the electronic ballot images and forwarded the request to the County Attorney.  The County Attorney, treating the inquiry as a FOIL request, determined that Election Law § 3-222(2), barring examination of "voted ballots" absent a court order or legislative committee direction in the first two years following an election, precluded disclosure of the electronic copies of the ballots as an exemption to

FOIL pursuant to Public Officers Law § 87(2)(a). Petitioner appealed the decision to the County FOIL Appeals Officer, who affirmed denial of the request, citing Election Law § 3-222(2).

In June 2016, petitioner commenced this CPLR article 78 proceeding in Supreme Court against the Commissioners of the County Board and the County FOIL Appeals Officer, seeking an order directing release of the ballot copies. Petitioner argued that Election Law § 3-222(1), which restricts access to voting data on removable memory cards, does so only until the data is preserved and that subsection (2) restricts access to paper ballots but not electronic copies of the ballots. Respondents answered and raised affirmative defenses, including that the electronic ballot copies were barred from release by Election Law § 3-222(2) without court order or legislative committee direction, which precluded disclosure of those materials pursuant to a FOIL request.[1]

Supreme Court granted the petition and ordered immediate release of the ballot images, concluding that Election Law § 3-222 does not shield them from disclosure (56 Misc 3d 354 [Sup Ct, Essex County 2017]). Applying standards developed under FOIL, the court determined that the two-year limitation on examination of "voted ballots" outlined in subsection (2) does not encompass electronic ballot copies (56 Misc 3d at 361-62). The court commented that differential treatment under the statute of paper ballots and

---

[1] One Commissioner of the County Board, Mark Whitney, supported the petition. The second Commissioner, Allison McGahay, opposed the petition. In addition to contending that Election Law § 3-222 precluded disclosure, Commissioner McGahay asserted that the action was time-barred by the abbreviated statutes of limitations contained in the Election Law – an argument we do not reach.

the preserved electronic copies sought here comports with the statute's anti-tampering purpose, as Election Law § 3-222(1) restricts access to voting data prior to preservation, and the risk of tampering with preserved electronic copies is remote (id.).

The Appellate Division affirmed, with two Justices dissenting (160 AD3d 1151 [3d Dept 2018]). A two-Justice plurality agreed with Supreme Court that the ballot images should be disclosed pursuant to FOIL, noting that FOIL exemptions are to be interpreted narrowly and that the statute's two-year preservation and restricted examination rule encompasses paper ballots but not electronic copies (160 AD3d at 1154). It determined that the statute reflects only a legislative intent to prevent tampering – not to protect confidentiality of ballots – and, thus, the distinction between paper ballots and electronic copies reflects the Legislature's awareness of different preservation procedures for what it viewed as two categories of materials (id. at 1154-55). One Justice concurred on a different rationale, reasoning that even if the electronic ballot copies are exempted from FOIL disclosure for two years, that time passed while the case was pending on appeal and a court order was no longer required (160 AD3d at 1157 [Aarons, J., concurring]).[2]

_____

[2] We must resolve this appeal based on the preserved arguments of the parties in light of the circumstances reflected in the record at the time the FOIL determination was made – and not based on subsequent events, including the passage of time. In a lone dissent, one of our colleagues determines that, rather than denying the request, the FOIL officer should have held it during the two-year post-election period and granted it at the expiration of that time. Because petitioner never made any such alternative request during the FOIL proceeding, nor was relief of that nature sought in the petition, we could not entertain that argument in this CPLR article 78 proceeding even if it was made by a party (see Matter of Khan v New York State Dept. of Health, 96 NY2d 879, 880 [2001] ["Judicial review of administrative determinations pursuant to CPLR article 78 is limited to questions of law. Unpreserved issues are not issues of law"] [citation omitted]). Moreover, the views

The two dissenting Justices determined that the FOIL standard – imposing a presumption of access and requiring courts to narrowly interpret disclosure exemptions – was not dispositive (160 AD3d at 1157 [Rumsey, J., dissenting]).  Rather, they reasoned that Election Law § 3-222 regulates "examination" of ballots during the first two years after an election and therefore does not authorize "public release" of ballots during that time (id. at 1157).  The dissent also disagreed with the plurality's conclusion that Election Law § 3-222(2) does not encompass the documents sought here, which "are merely electronic copies of the voted ballots" (id. at 1158-59).  The dissent explained that permitting access to electronic copies without a court order pursuant to FOIL, while at the same time recognizing the need for such an order to gain access to paper ballots, is "an illogical interpretation of the statute that should be avoided" (id. at 1159).

Respondents appealed as of right based on the two-Justice dissent.  We reverse and deny the petition on the basis that Election Law § 3-222(2), which prohibits examination of "voted ballots" absent a court order or legislative committee direction during the first two years following an election, precluded the County Board from granting petitioner's request for disclosure of electronic copies of those ballots.

FOIL requires that public agencies "make available for public inspection and copying all records" except where they fall within one of the statute's enumerated

expressed in the lone dissent involve issues never litigated at any point in this proceeding, including in this Court, to which neither party has had an opportunity to respond and which extend beyond the scope of this appeal.  We therefore have no occasion to further address them (see Misicki v Caradonna, 12 NY3d 511, 519-520 [2009]).

exemptions (Public Officers Law § 87[2]).  This presumption of access subject to legislative exemptions recognizes "the premise that the public is vested with an inherent right to know and that official secrecy is anathematic to our form of government" and the parallel "legitimate need" to keep certain government matters confidential (Matter of Fink v Lefkowitz, 47 NY2d 567, 571 [1979]).  We typically construe exemptions narrowly, and an agency has the burden of demonstrating that an exemption applies "by articulating a particularized and specific justification for denying access" (Matter of Capital Newspapers Div. of Hearst Corp. v Burns, 67 NY2d 562, 566 [1986]).

Public Officers Law § 87(2)(a), the FOIL exemption at issue, provides that an agency may deny access to records that are "specifically exempted from disclosure by state or federal statute."  While an applicable "state or federal statute" need not "expressly state it is intended to establish a FOIL exemption, we have required a showing of clear legislative intent to establish and preserve that confidentiality which one resisting a FOIL disclosure claims as protection" (Capital Newspapers, 67 NY2d at 567).  Respondents assert that Election Law § 3-222 creates such an exemption.  To determine whether Election Law § 3-222 reflects the requisite legislative interest in confidentiality, we must interpret the statute.

The plain text of a statute is the best indicator of legislative intent and thus the proper starting place in discerning its meaning (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]).  When a statute is part of a broader legislative scheme, its language must be construed "in context and in a manner that harmonizes the related

provisions and renders them compatible" (Matter of M.B., 6 NY3d 437, 447 [2006] [internal punctuation and citation omitted]). With respect to the Election Law, we have cautioned that "where . . . the Legislature 'erects a rigid framework of regulation, detailing . . . specific particulars,' there is no invitation for the courts to exercise flexibility in statutory interpretation" (Matter of Gross v Albany County Bd. of Elections, 3 NY3d 251, 258 [2004], quoting Matter of Higby v Mahoney, 48 NY2d 15, 20 n 2 [1979]). Legislative pronouncements specific to voting and the electoral process must be faithfully executed, as "[t]he sanctity of [that] process can best be guaranteed through uniform application of the law" (Matter of Gross, 3 NY3d at 258). Thus, we must also honor these principles in determining whether the FOIL standard is met.

Election Law § 3-222 contains three subsections relevant to this dispute that set forth a complex system of preservation and judicially supervised "examination" of ballots. Subsection (1) addresses preservation and examination of removable memory cards and similar media that temporarily store voting data.[3] Subsection (2) states a general rule as to preservation and examination of "voted ballots," providing,

> "Voted ballots shall be preserved for two years after such election and the packages thereof may be opened and the contents examined only upon order of a court . . . , or by direction of such committee of the senate and assembly if the

---

[3] Subsection (1) states, in relevant part, that such media "shall remain sealed against reuse" until preservation of the data and that, during the pre-preservation period, the data "may be examined upon the order of any court . . . of competent jurisdiction or . . . at the direction of a committee of the senate or assembly to investigate and report upon contested elections of members of the legislature."

> ballots relate to the election under investigation by such committee."

At the expiration of this two-year period of preservation and restricted access, "such ballots may be disposed of at the discretion of the officer or board having charge of them." Subsection (3) includes a similar preservation and examination rule for "protested, void and wholly blank ballots, open packages of unused ballots and all absentee and military, special federal, special presidential and emergency ballots and ballot envelopes."[4] In other words, all voted ballots – whether cast at the polls on election day or through some other process, such as absentee or military voting – are covered under the statute.

The plain text of Election Law § 3-222(2) – providing that "voted ballots" may be "examined" only pursuant to a court order or legislative committee direction for two years – bars disclosure of the electronic copies of ballots sought by petitioner in this case. By this language in subsection (2), the Legislature expressed a clear intent to restrict access to the ballots voted in an election; in order to see them, one must follow a specific procedure – i.e., obtain a court order or direction from a legislative committee investigating the election. Subsection (3) applies a similar two-year rule of restricted access to other types

---

[4] Subsection (3), referring to boxes of various types of voted and unvoted paper ballots and envelopes, provides that, "[u]nless otherwise ordered or directed by such a court, justice or committee, such boxes shall be opened and their contents and such packages and the envelopes containing voted ballots and ballot envelopes shall be destroyed, at the expiration of the [statutory preservation] period . . . , except that instead of being destroyed, they may be sold and the proceeds paid over in the manner provided with respect to the sale of books, records and papers pertaining to an election." There are no cases interpreting this provision, or indicating that such a sale has ever occurred. The propriety of such a sale is a matter beyond the scope of this appeal.

of ballots, including those not counted because they were void or blank and mail-in ballots like absentee and military ballots, with a sole exception for "sealed packages of unused ballots" that are subject to this limitation only for four months.

Together, therefore, subsections (2) and (3) establish a general default rule that ballots – whether counted or uncounted – are not freely accessible by the public during the first two years after an election and that, to examine them, a party must go through the prescribed channels supervised by the court or legislative committee, which were not followed here. There is no dispute that subsection (2) – addressing "voted ballots" – applies this default rule to the underlying paper ballots cast at the polls, and nothing in the text of section 3-222 indicates the Legislature intended to treat the electronic copies any differently than the underlying paper ballots.[5] There is no basis in the language of the statute to conclude that the restriction could be circumvented merely because the agency makes a copy (electronic or otherwise) of the voted ballot. Thus, taken at face value, the rule in Election Law § 3-222(2) that "voted ballots" are protected from examination during the first two years after an election absent court order or direction from a relevant legislative committee extends to electronic copies of those ballots. The same is true of absentee and military ballots, which are "voted ballots" under subsection (2) and, along with their envelopes, are also specifically protected in subsection (3).

---

[5] The reference in subsection (2) to "packages" of "voted ballots" – cited by the Appellate Division plurality as evidence that this provision excludes electronic copies – is not to the contrary. That language reflects the fact that the phrase "voted ballots" encompasses voted paper ballots, but it does not limit the scope of subsection (2) or imply that copies of such paper ballots are outside the statute's scheme of restricted access.

The legislative history of Election Law § 3-222 supports our understanding of the statute's plain text.  The statute has evolved significantly over time, reflecting our historical use of paper ballots for live voting on election day, the twentieth-century transition to the use of mechanical, lever-type voting machines and our recent conversion – in the wake of the federal Help America Vote Act of 2002 (52 USC § 20901 *et seq.*, as added by Pub L 107-252, 116 US Stat 1666) – to a paper ballot system with an electronic storage component.  Throughout that evolution, for more than a century, the Legislature has closely regulated access to ballots cast in an election.

The 1896 predecessor to Election Law § 3-222 provided in part that "ballots voted" in an election be returned to the ballot box, which "shall be securely locked and sealed" and "preserved inviolate for six months after such election and may be opened and [its] contents examined upon [court] order . . . ." (Election Law of 1896 § 111).  We observed soon after its enactment that the statute was intended to provide "a further check upon the perpetration of fraud by local boards of canvassers" by preserving evidence of votes, while at the same time ensuring prompt resolution of elections by limiting examination of ballots (see People ex rel. Brink v Way, 179 NY 174, 180 [1904]).  Thus, prior to the advent of electronic voting machines, the Election Law required judicial supervision over access to ballots in light of unique public policy interests at play in voting regulation.

The current version of the statute is the result of amendments enacted in 2011 that preserved its general purpose but conformed the text to reflect the transition from mechanical lever voting systems to the ballot scanning machines currently in use.

Subsection (1) was revised to replace references to "lock[ing]" and "unlock[ing]" the lever voting machines with the current requirements for handling removable memory cards (L 2011, ch 169). These amendments "establish[ed] procedures designed to ensure that election data recorded on the new voting systems are safeguarded and protected throughout the tabulation process," just as that information was protected during tabulation under the prior version of subsection (1) (Budget Division Mem, Bill Jacket, L 2011 ch 169). The amendments were intended to "ensure that all data collected during an election will be available for any subsequent examination pursuant to a court order or at the direction of a Senate or Assembly committee" (Budget Division Mem, Bill Jacket, L 2011 ch 169 [emphasis added]). This language – conveying that a court order is needed for access to data "subsequent" to preservation (i.e., after subsection [1] no longer applies) – reflects a legislative intent that the subsection (2) restrictions on examination extend to all versions of voted ballots, whether paper or electronic.

The 2011 amendments also show that the Legislature knew how to distinguish between paper and electronic materials when that was its intent. The amendments repurposed subsection (2), which previously applied only to "write-in" ballots, to confer its two-year preservation and restricted access rule on the broader category of "voted ballots" (L 2011, ch 282). At that time, subsection (3) specifically referenced (as it does now) "boxes containing voted paper ballots" (emphasis added), which were already protected. The Legislature clearly understood how the new voting system functioned – that paper ballots completed by voters were scanned into the machines and recorded in the

form of electronic data.  Yet, instead of using the narrower phrase "voted paper ballots"

utilized in subsection (3), the Legislature chose the broader term "voted ballots" when it

amended subsection (2) – indicating that the Legislature did not intend to restrict the scope

of subsection (2) to paper ballots or otherwise create a different rule for electronic ballot

copies.[6]  Notably, the 2011 amendments did carve out a special rule as to another category

of materials, providing in subsection (3) that, although ballots are generally subject to the

two-year preservation rule, "sealed packages of unused ballots" need only be retained for

four months (L 2011, ch 282).[7]  Given the absence of a similar carveout for electronic ballot

copies, we discern no legislative intent to treat those images differently from their voted

paper ballot counterparts, which are specifically subject to the statute's general two-year

restriction.

---

[6] We do not dispute that "voted ballots" includes "ballots cast directly on a voting machine—i.e., the display frame of the electronic machine on which the vote is cast" in addition to voted paper ballots (dissenting op [Stein, J.] at 11 n 1).  This supports our conclusion that the term "voted ballots" in subsection (2) broadly encompasses all voted ballots, whether in paper or electronic form.  The Legislature chose not to use a term that would have quite clearly achieved the result advocated by petitioner here – that only voted paper ballots are protected by the restricted access scheme in the statute.

[7] With the change to paper ballots for the majority of voters, election boards were compelled to order more than enough ballots to accommodate any voter that might come to the polls – even though many registered voters do not vote.  As a result, election boards would be left, after election day, with a proliferation of sealed packages of unused ballots. This exception was crafted to relieve the burden on election districts of storing such packages for two years in costly warehouse space (Mem in Support, Bill Jacket, L 2011, ch 282, 2011 NY Legis Ann at 207).  When the Legislature amended subsection (3) to provide that "sealed packages of unused ballots" need only be preserved for four months, it created a carveout from the general rule in subsections (2) and (3) that ballots (particularly voted ballots) are preserved and protected from unrestricted examination for two years.

Supreme Court and the Appellate Division plurality concluded that the only purpose served by Election Law § 3-222 is to preclude ballot tampering and, because electronic data is at little risk of interference once it has been preserved pursuant to subsection (1), it received no protection. Although protection against tampering is certainly one of the statute's aims, this narrow view of the statutory purpose is inconsistent with the legislative history and fails to appreciate the statute's place in the broader context and history of the Election Law.

The use of paper ballots dates back to the beginning of our Republic and was implemented in place of the "*viva voce*" or oral voting method used in colonial New York (see 1777 NY Constitution § 6). A clear intended benefit of the paper ballot "was to prevent bribery by rendering it difficult to determine how any elector voted" (Matter of Hopper v Britt, 203 NY 144, 157 [1911]). But ballot voting was not immune to corruption. Political parties printed colorful ballots designed to be identified from afar, and those paying for votes or otherwise seeking to coerce voters – such as employers intimidating their workers – physically "supervised" the polls (see Burson v Freeman, 504 US 191, 201-202 [1992]). Therefore, the principle of ballot secrecy was adopted in 1890 through comprehensive election reform legislation entitled "An act to promote the independence of voters at public elections, enforce the secrecy of the ballot, and provide for the printing and distribution of ballots at public expense" (L 1890, ch 262). The legislation criminalized the display of a marked ballot, created voting booths, prohibited electioneering within close range of the polls, and centralized the preparation of ballots (see L 1890, ch 262; see also People ex rel.

Coffey v Democratic Gen. Comm. of Kings County, 164 NY 335, 338 [1900]).  Since

1895, our Constitution has specifically provided that, whether voting is by ballot or another

method prescribed by law, "secrecy in voting be preserved" (1895 NY Constitution, art II,

§ 5).  To that end, the Election Law of 1896 contained detailed procedures intended "to

permit a secret ballot," as well as "secure an honest count," achieve "[s]ome finality of

action" by election boards, and "preserve, for a reasonable time, the best evidence" for

prosecuting fraud or investigating a contested election "in the event of judicial, or of

legislative, proceedings, instituted . . . after the election was closed" (Matter of Hearst v

Woelper, 183 NY 274, 281, 284 [1905]).  The predecessor to Election Law § 3-222 was

part of that reform legislation (Election Law of 1896 § 111).

Today's Election Law promotes secrecy of the ballot and integrity of vote casting

and canvassing in several ways.  For example, it specifically requires that "[t]he operating

of the ballot scanner by the voter while voting or the use of a privacy booth or ballot

marking device for marking a ballot shall be secret and obscured from all other persons"

with narrow exceptions for voters requiring assistance or supervising children (Election

Law § 8-300[2]).  Moreover, it criminalizes a range of actions: it is a misdemeanor for a

voter to "show" the ballot that person has marked or "reveal the contents" (Election Law §

17-130[10]) or for an election officer to "reveal" how any person voted (see Election Law

§ 17-126[1], [2]), in addition to other violations of polling place regulation (see generally

Election Law § 17-130).

Equally thorough canvass, recanvass and audit procedures govern the treatment of voted ballots and other related materials after the polls have closed. The Election Law sets forth step-by-step instructions that election inspectors must follow in closing voting machines, obtaining their tabulated results, handling the removable memory cards, and reconciling the number of paper ballots utilized against the number provided (Election Law §§ 9-102, 9-106). The instructions for canvassing paper ballots not already scanned at the close of voting are highly precise, dictating exactly how the paper ballots should be handled (i.e., unfolded, placed face down in one pile, then turned over one-by-one); the results interpreted, announced and marked; and any objections resolved (Election Law §§ 9-110, 9-112, 9-114, 9-116). Absentee, military and special ballots are canvassed according to similarly specific directions that mandate how such ballots should be removed from their envelopes, counted and recorded (Election Law § 9-209).

The Election Law provides for a recanvass of votes within, at most, 20 days from an election and dictates procedures in case of discrepancy between the results of the canvass and recanvass (Election Law § 9-208). It also requires an audit of "voter verifiable audit records from three percent of voting machines or systems" in each voting jurisdiction within 15 days of a general election (Election Law § 9-211). Further, election disputes are resolved in special summary proceedings, which "have preference over all other causes in all courts" (Election Law § 16-116) and abbreviated limitations periods (see e.g., Election Law § 16-106 [stating limitations periods for proceedings regarding casting or canvassing of ballots of 10, 20, or 30 days]).

Thus, the Election Law's closely regulated framework for handling of ballots and reviewing their contents balances ballot secrecy, anti-tampering measures, accuracy and finality. Election Law § 3-222 is an integrated component of this system and evinces the same public policy interests in prescribing detailed rules for when and how voted ballots may be examined. The plain language of the statute, viewed in harmony with the broader Election Law regime, demonstrates a clear legislative intent to exempt these copies from public disclosure via a FOIL request during the restricted access period. As observed in an affidavit submitted by a Commissioner of the New York State Board of Elections, Election Law § 3-222 reflects a legislative acknowledgement "that unfettered access to voted ballots could lead to unfettered mischief in the outcome of elections."

While Election Law § 3-222 expresses a legislative interest in confidentiality, it does not categorically preclude access to voted ballots of any kind or electronic copies of those ballots. It provides a procedure by which a party may petition a court for access, thereby ensuring that any resulting "examination" occurs with judicial supervision. By restricting access to voted ballots for a two-year period following an election – subject to precise statutory mechanisms for addressing election disputes, including allegations of tampering – the statute balances the competing concerns of finality and transparency. Without doubt, the confidentiality promised in the Election Law is not absolute – there are occasions during the official canvassing, objection and judicial challenge processes when revelation of a particular person's vote may be unavoidable. But the Legislature has taken steps to guard against unjustified erosion of the policies of ballot secrecy and finality by curbing

the extent to which parties with no role in these official processes may gain access to voted ballots.

Supreme Court and the Appellate Division plurality relied on the FOIL presumption of access to conclude that electronic ballot copies are subject to disclosure, reasoning that Election Law § 3-222 does not expressly carve out an exemption for those materials. But, as we have demonstrated, that general presumption is rebutted here, in light of the clear legislative intent to restrict access to voted ballots except by way of the detailed regulatory scheme set forth in section 3-222. Election Law § 3-222 takes requests for access to ballots out of the hands of FOIL officers during the restricted examination period, instead authorizing courts and legislative committees to supervise limited examination of the materials.

Moreover, interpreting section 3-222 to permit FOIL disclosure of electronic ballot copies during the restricted access period would be incompatible with our treatment of other documents under FOIL. Such a reading would allow statutory protections to be easily evaded merely by requesting a copy of an otherwise exempt document rather than the original – an interpretation that would effectively nullify FOIL exemptions. When the Legislature shields a document from disclosure, protection naturally extends to copies of that document; indeed, the materials supplied in response to a FOIL request are always copies. The FOIL rule that we interpret exemptions from disclosure narrowly does not require that we disregard this common-sense understanding of legislative intent by drawing

an unprecedented distinction between originals and copies not driven by the text of the statute and contradicted by the legislative materials.

Petitioner's reading of the statute would allow for near-immediate public access to electronic ballot copies, thereby circumventing the Election Law's established process for ensuring the accuracy and transparency of election results in a timely, orderly, and transparent manner.  Because the preservation process involves simply transferring data onto a hard drive and can be completed within hours after an election, petitioner's interpretation would enable disclosure of electronic ballot copies and invite any FOIL requester's interpretation of the results (based on incomplete data, since not all voted ballots are scanned) prior to completion of critical post-polling procedures like the canvass and three-percent audit.  Political parties, candidates, news agencies (or quasi news agencies) could obtain this data and offer the public their own version of the "canvass" before the official results were certified by the Board of Elections.[8]  Competing pronouncements concerning the results of elections from various unofficial sources – or

---

[8] To the extent that petitioner argues that unrestricted public access to electronic ballot copies via FOIL would serve a public interest in ensuring the accuracy of results soon after an election, such a view is overstated.  Only a subset of ballots cast in an election are scanned and produce ballot images – some are hand counted (see Election Law §§ 9-110, 9-209).  Thus, review of electronic data of this type affords an incomplete picture of election results.  A comprehensive review of all ballots cast in an election could be conducted only pursuant to the restricted access scheme set forth in Election Law § 3-222(2), (3).

post hoc challenges to official results based on these private vote canvasses – would undermine the integrity of the official results and the principle of election finality.[9]

We have always had paper ballots of one kind or another (e.g. absentee, military and the like) but, for decades, most New Yorkers cast their votes without a ballot, by pulling a lever at a polling place. Votes cast by pulling a lever did not create "records" or "documents" and did not implicate FOIL (nor is there precedent suggesting that paper ballots cast by absentee or military voters are disclosable through the FOIL rubric). Although there has been a change in the procedure most New Yorkers use when voting on election day – and scanning technology certainly simplifies the canvassing process for votes cast by paper ballot – the Legislature, despite recent amendments to relevant provisions of the Election Law, has not lifted the restrictions on post-election examination of voted ballots. The Election Law's close regulation of ballot access manifests the Legislature's accumulated wisdom regarding how best to safeguard our elections, including by facilitating appropriate review of ballots pursuant to judicial oversight under

---

[9] Although electronic ballot copies are stored in a randomized fashion, certain political parties (particularly minor parties) have so few members in less populated districts that electronic ballot copies from primary elections may enable a FOIL requester to ascertain the substance of individual voters' cast votes shortly after an election. Likewise, under petitioner's interpretation of section 3-222, the statute would not preclude FOIL disclosure of absentee ballots and ballot envelopes (which could, like other documents subject to FOIL, be copied for the purpose of FOIL disclosure) – despite its express interdiction against "examination" of such documents absent a court order or legislative direction. Such results would undermine ballot secrecy and finality in elections and circumvent the statutory mechanisms in place for review of ballots.

section 3-222. Because electronic ballot copies are "voted ballots" governed by Election

Law § 3-222(2), petitioner's request for disclosure was properly denied.

Accordingly, the order of the Appellate Division should be reversed, with costs, and

the petition dismissed in its entirety.

Matter of Kosmider v Whitney

No. 41

STEIN, J. (dissenting):

The Freedom of Information Law (FOIL) is premised upon the legislature's stated view that "[a] free society is maintained when government is responsive and responsible to the public, and when the public is aware of governmental actions" (Public Officers Law § 84). The legislature has determined that "[t]he more open a government is with its

- 1 -

citizenry, the greater the understanding and participation of the public in government"
(Public Officers Law § 84). In precious few contexts are public participation and
confidence, as well as governmental accountability and transparency, more important than
with respect to the electoral process through which the citizenry democratically selects its
representatives. However, the majority holds, based on abstract policy considerations, that
electronic ballot images are exempt from FOIL disclosure pursuant to Election Law § 3-
222 (2). In so doing, the majority improperly departs from the plain language of the
Election Law, as well as the express policy of this state favoring open government.

Election records, like all governmental agency records, are exempt from FOIL
disclosure only if they are subject to a legislatively enumerated exemption. Here, no such
exemption exists. The unambiguous text of the Election Law demonstrates that electronic
ballot images are not "voted ballots" within the purview of Election Law § 3-222 (2), and
legislative history further demonstrates that this statutory provision was primarily intended
to safeguard paper ballots against tampering—a concern absent vis-à-vis electronic images
of ballots. In light of the dearth of statutory text or legislative history indicating that the
legislature intended for electronic ballot images to be confidential and excluded from FOIL
disclosure, I agree with Supreme Court and the Appellate Division plurality that such
images must be disclosed.

## I.

A review of certain provisions of the Election Law and their history is helpful to
understanding the thrust of the FOIL request under review and the precise question before

this Court.    Beginning in 2005 with its enactment of the Election Reform and Modernization Act, the legislature made a series of amendments to the Election Law requiring the replacement of lever voting and punch card machines with electronic optical scan voting systems or direct recording electronic machines (see L 2005, ch 181 §§ 6, 9, 11; L 2007, ch 506, § 1; Election Law §§ 7–202 [4]; 7-209), as mandated by federal law (see 52 USC §§ 20902, 21081).   Generally, to cast a vote on an electronic optical scan voting machine, a voter scans a marked paper ballot into a ballot scanner (see Election Law § 8-312 [1], [2]).   The electronic machine scans the paper ballot, interprets the vote marked on the ballot, tabulates the voting results of all ballots thus cast, and saves images of every cast ballot in both its resident memory and on portable memory devices (see Election Law § 9-102 [1], [2]; 9 NYCRR 6209.1 [u]; 6209.2 [a] [7]).   The Election Law also authorizes the use of direct recording electronic machines, upon which a voter may cast a vote directly on the face of the machine; the machine then produces a "voter verified permanent paper record" (Election Law § 7-202 [1] [j]; see Election Law § 7-202 [4]).

For both the electronic scan machine and the direct recording machine, the Election Law requires that the voting machine "retain all paper ballots cast or produce and retain a voter verified permanent paper record," and provides that "such ballots or record shall allow a manual audit and allow for preservation in accordance with the provisions of [Election Law §] 3-222" (Election Law § 7-202 [1] [j] [emphasis added]; see 9 NYCRR 6209.2 [a] [3]).   The electronic ballot scanner retains the paper ballots by depositing each

ballot into a secure box (see Election Law § 7–202 [1] [j]; Matter of Johnson v Martins, 15 NY3d 584, 586 [2010]).

After the polls are closed and the votes canvassed, the election officials must "package and seal . . . voted ballots and place them in one or more boxes or containers . . . and securely lock and seal such boxes or containers" (Election Law § 9-124 [1]). Election officials may either include within such boxes of "voted ballots" one portable memory device from each ballot scanner (Election Law § 9-124 [1]), or the portable memory device may be separately enclosed in a sealed container with the corresponding results in order to allow for the use of the device to provide an unofficial tally of results (see Election Law §§ 9-102 [2] [d]; 9-124 [2]). In either event, the boxes and containers of sealed voted ballots and portable memory devices are filed with the applicable board of elections (see Election Law §§ 9-102 [2] [d]; 9-124 [3] [a], [d]).

Pursuant to Election Law § 3-222 (1), "removable memory cards or other similar electronic media shall remain sealed against reuse until such time as the information stored on such media has been preserved," except that such media devices, and the information stored thereon, may be accessed prior to preservation upon an order of a court or at the direction of a legislative committee investigating a contested election. On the other hand, Election Law § 3-222 (2) provides that "[v]oted ballots" must be preserved for two years following an election, and that "the packages thereof may be opened and the contents examined only upon" court or legislative order (Election Law § 3-222 [2]). Following expiration of the two-year preservation period, "voted ballots" may be either destroyed or

sold (Election Law § 3-222 [3]). Neither paper ballots retained by an electronic ballot scanner, nor electronic images of paper ballots saved to the removable memory card, identify the voter; thus, Election Law § 3-222 (1) and (2) do not implicate ballot secrecy.

II.

Turning to the instant matter, in December 2015, petitioner Bethany Kosmider requested from respondents Essex County Board of Election Commissioners Mark Whitney and Allison McGahay copies of electronic voting ballot images recorded on the removable memory devices of the electronic scanner voting machines used in Essex County during the November 2015 general election. Treating the request as being made pursuant to FOIL, the Essex County Attorney and Records Access Officer denied petitioner's request. The County Attorney opined that the images could not lawfully be disclosed or examined except pursuant to court order under Election Law § 3-222 and, consequently, were exempt from disclosure under Public Officers Law § 87 (2) (a)—the FOIL provision which permits agencies to deny access to records otherwise exempt from disclosure by state or federal statute. Respondent Chair of the Board of Supervisors of Essex County denied petitioner's administrative appeal. Petitioner then commenced the instant timely CPLR article 78 proceeding seeking release of the electronic ballot images and tabulated vote records.

Supreme Court granted the petition, concluding that Election Law § 3-222 restricted access to the electronic images only until the images were preserved under subdivision (1) and that, once preservation was complete, the statute did not render such images exempt

from disclosure, unlike the paper ballots covered by subdivision (2). On appeal, the Appellate Division affirmed (160 AD3d 1151 [3d Dept 2018]). Two Justices agreed with Supreme Court's analysis, one Justice concurred in result on the ground that any confidentiality under Election Law § 3-222 (2) had expired two years after the election, and two Justices dissented in favor of precluding disclosure. Respondents appealed to this Court as of right (see CPLR 5601 [a]).

III.

The issue before us distills to whether, as respondents argue, electronic ballot images are exempt from FOIL disclosure as "voted ballots" under Election Law § 3-222 (2) that must be preserved for two years, subject to examination only upon court order or legislative direction. The proper analysis of this question necessitates a review of the well-established principles governing FOIL disputes. Codified in the Public Officers Law, FOIL mandates that governmental "agenc[ies] shall . . . make available for public inspection and copying all records, except that such agenc[ies] may deny access to records or portions thereof that" fit within certain statutory exceptions (Public Officers Law § 87 [2]). FOIL is grounded in "the premise that the public is vested with an inherent right to know" and, "[b]y permitting access to official information long shielded from public view, the act permits the electorate to have sufficient information in order to make intelligent, informed choices with respect to both the direction and scope of governmental activities" (Matter of Fink v Lefkowitz, 47 NY2d 567, 571 [1979]). Indeed, "judicious use of the provisions of [FOIL] can be a remarkably effective device in exposing waste, negligence

and abuses on the part of government; in short, 'to hold the governors accountable to the governed'" (id., quoting NLRB v Robbins Tire & Rubber Co., 437 US 214, 242 [1978]).

We have long recognized that FOIL is "based on a presumption of access" to records (Matter of Madeiros v New York State Educ. Dept., 30 NY3d 67, 73 [2017]; see Matter of Data Tree, LLC v Romaine, 9 NY3d 454, 462 [2007]; Matter of Capital Newspapers Div. of Hearst Corp. v Burns, 67 NY2d 562, 566 [1986]). Consistently and repeatedly, we have instructed courts and agencies that FOIL's disclosure mandate must "'be liberally construed and its exemptions narrowly interpreted so that the public is granted maximum access to the records of government'" (Matter of Town of Waterford v New York State Dept. of Envtl. Conservation, 18 NY3d 652, 657 [2012], quoting Matter of Capital Newspapers, Div. of Hearst Corp. v Whalen, 69 NY2d 246, 252 [1987]). Thus, an agency relying on the applicability of an exemption to avoid disclosure bears the burden of establishing that the exemption applies (see Public Officers Law § 89 [4] [b]), and "[o]nly where the material requested falls squarely within the ambit of one of these statutory exemptions may disclosure be withheld" (Matter of Fink, 47 NY2d at 571; see Matter of Newsday, Inc. v Empire State Dev. Corp., 98 NY2d 359, 362 [2002]).

As relevant here, the FOIL regime permits an agency to deny disclosure of "records or portions thereof" that "are specifically exempted from disclosure by state or federal statute" (Public Officers Law § 87 [2] [a]). To establish the applicability of this exemption, an agency need not establish that the statute at issue "expressly state[s] [that] it is intended to establish a FOIL exemption"; however, there must be a "showing of clear legislative

intent to establish and preserve that confidentiality which one resisting a FOIL disclosure claims as protection" (Burns, 67 NY2d at 567; see Matter of M. Farbman & Sons v New York City Health & Hosps. Corp., 62 NY2d 75, 81 [1984]; see e.g. Matter of New York Civ. Liberties Union v New York City Police Dept., 32 NY3d 556, 565 [2018]; Matter of John P. v Whalen, 54 NY2d 89, 98 [1981]).

Of course, FOIL governs the disclosure of records requested under its umbrage, even if those records implicate the Election Law. FOIL compels disclosure by agencies, which the legislature has defined as "any state or municipal department, board, bureau, division, commission, committee, public authority, public corporation, council, office or other governmental entity performing a governmental or proprietary function for the state or any one or more municipalities thereof, except the judiciary or the state legislature" (Public Officers Law § 86 [3]). State and local boards of election plainly fall within the parameters of this definition and are not included in the express exemptions established by the legislature (see Election Law § 3-100 [creating the state board of elections within the executive department]; Election Law § 3-200 [authorizing county boards of election]; see 9 NYCRR 6202.1 [state board of elections regulations governing public access to agency records in compliance with FOIL]). "Records" subject to FOIL disclosure are also broadly defined to include "any information kept, held, filed, produced or reproduced by, with or for an agency . . . in any physical form whatsoever" (Public Officers Law § 86 [4]; see Matter of Newsday, Inc., 98 NY2d at 362 [documents in possession of an agency necessarily become agency records under FOIL]; Matter of Washington Post Co. v New

York State Ins. Dept., 61 NY2d 557, 565 [1984] [documents possessed by an agency are "records" within the meaning of FOIL even if they originated outside the government]). Thus, boards of election and the records they hold are subject to the mandate of FOIL disclosure, unless such records fall within a FOIL exemption.

IV.

Neither the statutory language nor the legislative history supports the conclusion urged by respondents, and adopted by the majority, that electronic ballot images are exempt from FOIL disclosure pursuant to Election Law § 3-222 and Public Officers Law § 87 (2) (a).  This is because electronic ballot images do not constitute "[v]oted ballots" (Election Law § 3-222 [2]) and, therefore, they are not subject to the two-year sealing requirement of Election Law § 3-222 (2).

"It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature" and, because "the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998] [internal quotation marks and citations omitted]). If the words chosen "have a 'definite meaning, which involves no absurdity or contradiction, then there is no room for construction and courts have no right to add or take away from that meaning'" (id. at 583, quoting Tompkins v Hunter, 149 NY 117, 122-123 [1896]).  If the words are not defined by statute, "we construe words of ordinary import with their usual and commonly understood meaning" (Rosner v Metropolitan Prop. & Liab.

Ins. Co., 96 NY2d 475, 479-480 [2001]).  Additionally, we should inquire "into the spirit

and purpose of the legislation, which requires examination of the statutory context of the

provision as well as its legislative history" (Nostrom v A.W. Chesterton Co., 15 NY3d 502,

507 [2010] [internal quotation marks and citation omitted]; see Albany Law School v New

York State Off. of Mental Retardation and Dev. Disabilities, 19 NY3d 106, 120 [2012]).

Election Law § 3-222 (2)—included in a provision entitled "Preservation of ballots

and records of voting machines"—provides that

> "[v]oted ballots shall be preserved for two years after [an]
> election and the packages thereof may be opened and the
> contents examined only upon order of a court or judge of
> competent jurisdiction or by direction of [a] committee of the
> senate and assembly if the ballots relate to [an] election under
> investigation" (emphasis added).

The Election Law does not specifically define the term "voted ballots."  It does, however,

define the terms "ballot" and "official ballot" (Election Law § 1-104 [8], [18]).  When

referring to voting machines or systems, a "ballot" is defined as "that portion of the

cardboard or paper or other material or electronic display within the ballot frame"

containing the candidate name, party, and any propositions or referendums (Election Law

§ 1-104 [18])—in other words, the paper ballot inserted into an electronic scanning

machine, or the display screen of a direct recording electronic machine when a vote is being

cast.  An "official ballot" is likewise defined as either the "the paper ballot on which the

voter casts [a] vote, or the face of a voting machine as prepared for the voter to cast [a]

vote" directly on the machine (Election Law § 1-104 [8]).

The majority's analysis relies on an unfounded assumption that electronic images of cast paper ballots are, themselves, "ballots." However, electronic images of paper ballots do not meet the statutory definition of "ballots" or "official ballots" because they are neither a paper ballot nor an electronic display within the ballot frame on the face of a voting machine as prepared for a voter to cast a vote. By logical extension, electronic images of cast ballots cannot constitute "voted ballots" under Election Law § 3-222 (2) [emphasis added]).[1] A voter casts only one "ballot" in an election, and a scanned image thereof is not, itself, a voted "ballot." Thus, while the majority may be correct that the Election Law closely regulates access to "ballots" in order to ensure the integrity of elections (see majority op, at 16), it does not follow that the legislature intended to restrict access to scanned electronic ballot images—the records sought by petitioner in this case.

Moreover, the language chosen by the legislature to describe when access to sealed "voted ballots" may be permitted indicates that the legislature was concerned with the paper ballots on which votes had been cast, not electronic images thereof. For example, Election Law § 3-222 (2) states that "packages" of voted ballots may be opened only upon

---

[1] The majority asserts that the legislature knew how to differentiate between "voted paper ballots" and electronic ballot images, observing that the term "voted paper ballots" appears in Election Law § 3-222 (3). However, while Election law § 3-222 (3) does refer specifically to "voted paper ballots," the distinction between "voted paper ballots" and "voted ballots" is not that the latter includes electronic images of paper ballots but, rather, that the former does not include those ballots cast directly on a voting machine—i.e., the display frame of the electronic machine on which the vote is cast. This distinction is made clear by the context of the legislature's use of the term "voted paper ballots"; specifically, subdivision (3), uses the term "voted paper ballots" in reference to the reuse of the "boxes containing" such ballots.

court or legislative order.  The images contained on the portable memory devices are not preserved in "packages"; indeed, the term "packages" is used throughout the Election Law to refer to sealed and boxed <u>paper</u> ballots (<u>see</u> Election Law §§ 9-102 [2] [d]; 9-124 [1]).

Further, Election Law § 9-106 specifically provides that, after the polls are closed and before any "boxes or envelopes containing <u>voted ballots</u> are opened," all "paper ballots furnished to the election district or poll site" must be accounted for, illustrating that the term "voted ballots"—as used by the legislature—refers to the <u>paper</u> ballots, not the electronic images generated by the electronic vote scanner (emphasis added).  Likewise, Election Law § 7-202—governing the requirements of electronic voting machines—specifically instructs in two separate provisions that electronic voting machines must produce "paper ballots" or a "paper record" that may be preserved in accordance with Election Law § 3-222, with no similar reference to any requirement for sealing and preventing access to electronic ballot images under section 3-222  (Election Law § 7-202 [1] [i]; [j]).

Contrary to the majority's assertion that "nothing in the text" of the Election Law demonstrates any legislative intent to treat electronic ballot images differently from the underlying paper ballots (majority op, at 9), the legislature's very use of the terms "voted ballots" and "packages" in both Election Law § 3-222 (2) and other statutory provisions plainly differentiates between paper ballots and electronic images thereof.  Thus, while we have cautioned that, in the election context, the legislature has "erect[ed] a rigid framework of regulation" with regard to which there is no room "for the courts to exercise flexibility"

(Matter of Gross v Albany County Bd. of Elections, 3 NY3d 251, 258 [2004]), it is the majority—not I—who disregards the language of the Election Law and fails to faithfully execute the relevant legislative pronouncements.

V.

Not only is any apparent textual basis lacking to support a conclusion that Election Law § 3-222 (2) exempts electronic ballot images from disclosure under FOIL, the majority—despite a concerted effort to draw from all corners of the Election Law and various public policy considerations—otherwise fails to demonstrate that the legislative intent behind the statute was to ensure confidentiality and preclude public disclosure of such records (see Burns, 67 NY2d at 567). A review of the relevant legislative history reveals that the legislative purpose underpinning Election Law § 3-222 is not, as the majority surmises, to maintain ballot confidentiality but, rather, to limit access to original ballots cast in order to prevent tampering and preserve the integrity of such original ballots with a view toward ensuring a valid and accurate method through which election results may be audited and verified.

The preservation and sealing of ballots and ballot boxes date back to 1896. This Court has explained that the legislature's original enactment of the requirement that ballots and ballot boxes be sealed and preserved for a limited time "would seem to be that it furnishes a . . . check upon the perpetration of fraud by local boards of canvassers" (People ex rel. Brink v Way, 179 NY 174, 180 [1904]). The preservation and sealing requirement was intended to "minimize the opportunity for fraud at elections and . . . render[] available

the best evidence in proceedings instituted to try the title to public office, not only as between rival candidates for office, but as well in actions brought by the people of the state against individuals who may intrude into or usurp public office" (People ex rel. Brown v Freisch, 215 NY 356, 367 [1915]; see People ex rel. Brink, 179 NY at 180; Matter of Stewart, 155 NY 545, 549-550 [1898] [prior to 1896, the Election Law "provided no adequate restraints upon the officials whose duty it was to canvass the votes" because the ballots were immediately destroyed, and the Election Law of 1896 was "the culmination of a series of acts seeking . . . such safeguards as will protect the candidate and the general public against the mistakes or frauds of the inspectors"]; see also People ex rel. Dailey v Livingston, 79 NY 279, 284 [1879] [observing that the legislative purpose behind an earlier statute requiring sealing and preservation of certain ballots and ballot boxes was that the ballot "boxes should be so sealed that they could not be opened without breaking the sealing" given "the great temptation and danger of fraud in tampering with the ballots"]).

In other words, the preservation of ballots and the statutory restrictions on access to paper ballots were aimed at ensuring that the actual ballots upon which citizens cast their votes were available for verification of election results and were maintained in such a manner that they were not vulnerable to alteration or tampering. Indeed, the majority's contrary claim that Election Law § 3-222 (2) is partly intended to ensure the confidentiality of voted ballots is belied both by the fact that the voted ballots do not identify the voter and by the legislature's choice to permit packages of voted ballots to be sold after expiration of

the two-year preservation period (see Election Law § 3-222 [3]; Comm on Open Govt, FOIL-AO-19107 [2014]).[2]

Nor does the legislative history surrounding the legislature's inclusion of the phrase "voted ballots" in Election Law § 3-222 (2) reveal any intent to shield electronic ballot images from FOIL disclosure. Prior to 2011, Election Law § 3-222 (2) required preservation and sealing of "write-in ballots" (L 2011, ch 282). Local boards of elections, faced with significant costs in preserving both used and unused ballots under Election Law § 3-222 (2) and (3), pushed for amendments to the statute that would relieve the financial burden of storing unused election ballots. In response, the legislature, in an act to amend the election law "in relation to the preservation of unused ballots," clarified that only used ballots need be retained for two years, while unused ballots may be discarded after four months (L 2011, ch 282). As part of these amendments, the legislature inserted the term "voted ballots" into Election Law § 3-222 (2). No legislative purpose for the amendments, or this specific change, was articulated, other than the general goal of "reliev[ing] the overwhelming financial burden of local and county boards of election from warehouse costs associated with the storage of excessive unused election ballots" (Memorandum in Support of Legislation, Bill Jacket, L 2011, ch 282, at 7). In this context, the most logical intent to be gleaned from the legislature's choice of the term "voted ballots" is that it was merely clarifying that only "cast" or "voted" paper ballots need be retained. There is

---

[2] I note that any actual decision by a board of elections regarding whether to sell or discard the voted ballots is irrelevant. The salient fact is that the legislature has authorized the sale of such ballots, as it is the legislature's intent that governs the dispute before us.

absolutely no basis to conclude that the legislature intended to broaden the scope of Election Law § 3-222 (2) and the meaning of voted "ballots" to preclude access to electronic images of ballots once preserved.

In concluding that such an intent exists, the majority relies on a statement in a 2011 bill jacket relating to amendments to Election Law § 3-222 (1) that imposed a requirement that memory cards and electronic media be sealed against reuse until the information on such devices is preserved (see L 2011, ch 169). These amendments were necessary to update subdivision (1) which, despite the transition from lever machines to electronic voting machines, still referred to the outdated locking of the voting machines, themselves (see L 2011, ch 169). Accompanying these 2011 amendments to Election Law § 3-222 (1), a Division of the Budget Bill Memorandum accurately asserted that the amendments "established procedures designed to ensure that election data" is "safeguarded and protected throughout the tabulation process" (Division of the Budget Bill Memorandum, Bill Jacket, L 2011, ch 169, at 7). However, the memorandum also inaccurately stated that requiring the retention and preservation of electronic data storage devices would "ensure that all data collected during an election will be available for any subsequent examination pursuant to a court order or at the direction of a Senate or Assembly Committee" (id.). The latter statement is necessarily inaccurate because the amendments at issue pertained only to the language of Election Law § 3-222 (1), not subdivision (2). That is, the amendments on which the Division of the Budget was commenting did not pertain to the statutory provision or language on which the majority relies to hold that the electronic ballot images

are exempt from FOIL. If, as the majority contends, electronic ballot images were already required to be preserved under seal as "voted ballots" pursuant to subdivision (2) of Election Law § 3-222, then the amendments to Election Law § 3-222 (1) were, in fact, unnecessary and redundant (see Majewski, 91 NY2d at 587 ["A construction that would render a (statutory) provision superfluous is to be avoided"]). Thus, the majority's reliance on the Division of the Budget's characterization—an isolated statement by a non-legislator relating to amendments of a different provision of the statute—is hardly convincing (cf. Consumer Prod. Safety Commn. v GTE Sylvania, Inc., 447 US 102, 118 [1980]; Murphy v Empire of Am., FSA, 746 F2d 931, 935 [2d Cir 1984] ["isolated remarks" in legislative history "are entitled to little or no weight, particularly when they are unclear or conflict with one another"]).

The absence of legislative history reflecting an intent to maintain confidentiality of the content of voted ballots, or electronic images of voted ballots, is significant. As the majority points out, if an original record is protected from disclosure under a FOIL exemption because another statute grants that record confidentiality, then a copy of that confidential record would be protected from disclosure to the same extent as an original. This is because, where confidentiality is the goal, the same harm comes from release of the original and any copies, electronic or otherwise. However, because the purposes of the sealing requirement of Election Law § 3-222 (2) are preservation and prevention of tampering—not confidentiality—a logical distinction may easily be drawn between the original ballot and the electronic image thereof. Providing copies of digital images—where

those images are, as here, possessed by the agency without necessitating access to the paper ballots in contravention of Election Law § 3-222 (2)'s sealing requirement—simply does not undermine the preservation of, or increase the risk of tampering with, the original ballots in the same manner as providing direct access to those original paper ballots, nor does it alter or affect the security of the electronically preserved images retained by election authorities.

## VI.

The remainder of the majority's analysis strays far from the legislative purpose underlying Election Law § 3-222 to reflect, instead, on the general public policies of ballot secrecy, minimization of opportunities for vote bribing or extortion, and finality in elections. While the legislative purpose of section 3-222 is relevant to whether it creates a FOIL exemption, the majority's subjective balancing of policy concerns is not. To be sure, these are significant and laudable public policy concerns, and the legislature has undertaken steps to further these goals (see e.g. Election Law §§ 8-312 [1]; 17-130 [10]; 17-126; see also NY Const art. II, § 7). However, there is no indication that the legislature believed these objectives would be undermined by permitting the release of electronic ballot images under FOIL and, notably, the majority fails to adequately explain how disclosure of the

images will have any adverse effect on the accuracy, transparency, integrity, or timeliness,[3] of the electoral process.[4]

While the majority theorizes that FOIL disclosure of electronic ballot images would undermine the integrity of elections, in my view, just the opposite is true—such disclosure furthers the legislative purpose of Election Law § 3-222 (2) by providing a check against fraud perpetrated by governmental actors and promoting accuracy in our electoral process. As petitioner aptly notes, there are significant public policy concerns relating to the integrity of the electoral process that weigh in favor of disclosure, such as permitting scrutiny of voting machines and their interpretations of the votes, promoting access to evidence of inaccurate tabulation results, and ensuring that the public has a means of

---

[3] A FOIL requestor who obtains electronic ballot images will nevertheless be bound by the time limitations prescribed in the Election Law (see generally Election Law art 16). While the majority speculates that news agencies, political parties, and candidates may falsely or inaccurately report results of canvasses, it overlooks the possibility that such entities could actually advance election transparency by verifying and checking the accuracy of the results reported by election officials.

[4] The majority posits that, in some political districts, certain political parties may have so few members that electronic ballot images from primary elections may enable a FOIL requester to ascertain the nature of an individual's vote. As the majority recognizes, ballot secrecy is not absolute and, insofar as voter registration rolls are accessible by the public and election results may be announced by geographic area (see generally Election Law §§ 5-602; 5-604), a determined individual could—even without electronic ballot images— possibly identify a particular individual's vote in a sparsely populated district by means of other available public records. Notably, however, FOIL does permit—under a different exception not invoked by respondents here—the denial of access to records that, if disclosed "would constitute an unwarranted invasion of personal privacy" (Public Officers Law § 87 [2] [b]; see Public Officers Law § 89 [2] [b]). As respondents did not assert this exemption as a basis for denying petitioner's FOIL request, respondents may not rely on it now (see Matter of Madeiros v New York State Educ. Dept., 30 NY3d 67, 74-75 [2017]).

checking fraud by election officials—the very purpose that prompted the legislature to enact the predecessor of Election Law § 3-222 in the first instance.

The majority observes that the record contains an affidavit of a Commissioner of the New York State Board of Elections asserting that disclosure of electronic ballot images could "lead to unfettered mischief in the outcome of elections" (majority op, at 16). Notably, that affidavit makes clear that the Commissioner's views "do not represent an official position of the State Board of Elections."  Moreover, petitioner also proffered an affidavit of a (different) Commissioner of the New York State Board of Elections, wherein that Commissioner asserted that, consistent with an advisory opinion rendered by the Committee on Open Government (see Comm on Open Govt, FOIL-AO-19107 [2014]), various counties have had a practice of releasing electronic ballot images upon request. According to this Commissioner, the purpose of Election Law § 3-222 (2) was merely "to preserve inviolate the chain of custody of voted paper ballots" and, "once the ballot images and cast vote records have been transferred to permanent storage media, there is no longer any reason to limit public access to copies of those electronic records, even though the original voted paper ballots must remain sealed for two years, unless there is a court order."

As the legislature has declared, it "is incumbent upon the state and its localities to extend public accountability wherever and whenever feasible" (Public Officers Law § 84). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy" (Purcell v Gonzalez, 549 US 1, 4 [2006]).  The legislature may well have determined that confidence in the integrity of the election system is best

promoted by permitting disclosure of the electronic ballot images, while concomitantly safeguarding the original paper ballots for audit and verification purposes.  Indeed, the legislature may reasonably have concluded, for the reasons stated above, that a court order should be required to access the actual paper ballots in connection with an election challenge, but that such limited access was inadequate to satisfy the legislature's intended scope of public disclosure under FOIL with respect to electronic ballot images, inasmuch as FOIL generally does not limit access to governmental records based on the identity of the requestor or the purpose for which the records are sought (see Matter of Daily Gazette Co. v City of Schenectady, 93 NY2d 145, 156 [1999]; Burns, 67 NY2d at 567).

Ultimately, if the legislature intended to exempt electronic ballot images from FOIL disclosure, such an intent could have been clearly evinced through either the statutory text or the legislative history of Election Law § 3-222 (2) (see Burns, 67 NY2d at 567; Matter of M. Farbman & Sons, 62 NY2d at 81).  In the absence of any such proof of intent, we are empowered only to "'read and give[] effect [to the relevant statutes] as . . . written by the [l]egislature, not as the court may think [they] should or would have been written if the [l]egislature had envisaged all the problems and complications which might arise'" (People v Tychanski, 78 NY2d 909, 911 [1991], quoting Parochial Bus Sys. v Board of Educ., 60 NY2d 539, 548–549 [1983]).  Insofar as the majority engages in its own weighing of policy

considerations to draw conclusions unsupported by the language or legislative history of

Election Law § 3-222 (2), I respectfully dissent.[5]

---

[5] I also find unavailing respondents' argument that the proceeding was untimely inasmuch as petitioner commenced this proceeding within four months of the denial of her administrative appeal (see CPLR 217 [1]; Public Officers Law § 89 [4] [b]).

Matter of Kosmider v Whitney

No. 41

WILSON, J. (dissenting):

The question debated by my colleagues is quite close; if I knew how the Legislature intended to resolve the ballot access question raised here, I would, of course, vote that way. Preservation of the status quo, giving the Legislature time to state a different intent if it

wishes, counsels in favor of concluding, as the majority does, that the Election Law protects ballots and ballot images from disclosure pursuant to Freedom of Information Law (FOIL) requests for two years from the date of the election in which those ballots were cast.

However, I disagree with the majority's result.  As the majority repeatedly recognizes, the ballots (and their electronic images) are subject to confidentiality for two years only (majority op at 1-2, 4-8, 14 and n 7).  No Judge on this Court believes that the ballot images are confidential after the two-year period has passed.  Likewise, the Essex Board of Elections agrees that ballots and images thereof are not confidential once two years have passed.  Indeed, no other conclusion would be possible, because the Legislature has directed that after two years, the voted ballots "shall be destroyed . . . except that instead of being destroyed, they may be sold and the proceeds paid over in the manner provided with respect to the sale of books, records and papers pertaining to an election" (Election Law § 3-222[3]).  It would be impossible to sell voted ballots if they remained confidential.

The election at issue in this case took place on November 3, 2015, about three and a half years ago.  Ms. Kosmider submitted her FOIL request in December 2015, well before the two-year period of confidentiality had expired, but at a time when it was quite clear, under Election Law § 3-222(3), that the confidentiality would expire on November 3, 2017.  So what should have happened when Ms. Kosmider requested the ballot images from the Essex County Board of Elections? FOIL provides that an agency faced with a FOIL request must respond in one of the following ways, depending on the circumstances present:

> "Each entity subject to the provisions of this article, within five business days of the
> receipt of a written request for a record reasonably described, shall [1] make such

record available to the person requesting it, [2] deny such request in writing or [3] furnish a written acknowledgement of the receipt of such request and a statement of the approximate date, which shall be reasonable under the circumstances of the request, when such request will be granted or denied[.]"  (Public Officers law § 89-3[a] [numbering added]),

Allowable responses [1] and [2] govern most disputes, because records are typically confidential or not.  Here, however, the records are protected from disclosure for a limited, legislatively predetermined time only: two years.  Neither [1] nor [2] is appropriate, but allowable response [3] plainly is.  "FOIL is based on a presumption of access in accordance with the underlying 'premise that the public is vested with an inherent right to know and that official secrecy is anathematic to our form of government'" (Matter of Madeiros v N.Y. State Educ. Dep't, 30 NY3d 67, 73 [2017], quoting Matter of Fink v Lefkowitz, 47 NY2d 567, 571 [1979]).  "FOIL is to be liberally construed and its exemptions narrowly interpreted" (Capital Newspapers, Div. of Hearst Corp. v Whalen, 69 NY2d 246, 252 [1987]).  Those principles, coupled with the statutory text, required the Essex Board of Elections to follow the third course, by promptly informing Ms. Kosmider that it would provide the requested ballot images to her on or shortly after November 3, 2017.

Thus, accepting the majority's conclusion that the Election Law provides a two-year FOIL exemption for ballots and ballot images, the proper result here would be to affirm the order of the Appellate Division, albeit on different grounds.  I note that, even under the majority's analysis, Ms. Kosmider can now obtain the very same ballot images she has been seeking all along if she refiles her request today.  Setting up meaningless procedural hurdles that have the potential to deprive the public of information about the operation of

their government (e.g., because a person interested in obtaining ballot images, now disabled from filing a FOIL request right after election, fails to do so on the date exactly two years after the election, and finds that the ballots were destroyed on the stroke of midnight) does not comport with the letter or spirit of FOIL. Of course, nothing in the majority's opinion prevents a Board of Elections from responding to an immediate request for ballot images by agreeing to provide those images upon expiration of the two-year period. One hopes that responsible Boards of Elections would do so.

The majority complains in a footnote that I am seeking to resolve the case "based on subsequent events" and on a ground not advanced by Ms. Kosmider (majority op at 4 n 2). That complaint warrants two responses, one simple, one complex.

The simple response is this: I do not suggest that the case should be determined by circumstances that did not exist at the time Ms. Kosmider made her request. When she made her request, New York law provided that the ballot images would have no confidentiality whatsoever two years from the date of the election. No one disputes that – not the majority, not my colleagues in dissent, and not the parties. At the moment Ms. Kosmider made her request, the legally required response under FOIL was to advise her of the approximate date on which the ballot images would be turned over to her.

The more complex response is that the majority's footnote evidences a misunderstanding of the role of our Court. When a legal issue is raised in a case before us, our role is to state clearly what New York law is, so that persons relying on or subject to

our laws will know what they mean.  To begin, it is important to distinguish between issues

that are raised and arguments that are raised, because the two are crucially different:

> "In our review we are confined to the *questions* raised or argued at the trial but not
> to the arguments there presented. 'Nor is it material whether the case was well
> presented to the court below, in the arguments addressed to it.  It was the duty of the
> judges to ascertain and declare the whole law upon the undisputed facts spread
> before them; and it is our duty now to give such judgment as they ought to have
> given.'"

(Persky v Bank of American Nat'l Ass'n, 261 NY 212 [1933] [citing Oneida Bank v

Ontario Bank, 21 NY 490, 504] [emphasis in original]).  That rule makes complete sense.

Why would we construct a legal system in which the state's highest court, in determining

the law, must be confined to whatever arguments the parties have made, to choose from

the least bad among them, however misguided they might be?

Here, the legal issue raised is: what response is required to a FOIL request made for

access to ballot images when the request is made shortly after an election?  That is a pure

question of statutory interpretation, in which our responsibility is to reconcile the Freedom

of Information Law and the Election Law.  When the issue "raises solely a question of

statutory interpretation, however, . . . we may address [it] even though it was not presented

below" (Richardson v Fiedler Roofing, Inc., 67 N.Y.2d 246, 250 [1986]).  Of course, if the

outcome would depend on facts that have not yet been determined by the lower courts, we

would not reach the issue.  Thus: "a new argument may be raised for the first time in the

Court of Appeals if it could not have been obviated or cured by factual showings or legal

countersteps in the court of first instance" (Rivera v Smith, 63 N.Y.2d 501, 516 n 5 [1984]

[citing American Sugar Refining Co. v Waterfront Comm., 55 NY2d 11, 25, app dsmd

sub nom. New York Shipping Assn. v Waterfront Comm., 458 U.S. 1101; Telaro v Telaro,

25 NY2d 433, 439; Cohen and Karger, Powers of the New York Court of Appeals (rev ed),

§§ 161-163]).[1]

Here, the facts are undisputed, and the legal question is pure: what response was the

Essex Board of Elections legally required to give Ms. Kosmider under FOIL?  Assume,

hypothetically, that the majority agrees with me that the Essex Board of Elections was

legally required under FOIL to advise her that the ballot images would be delivered to her

two years after the election.  In my view, the majority has both the power and responsibility

to say so.  The majority's refusal to do so, if it is on the ground that the parties missed the

correct answer, would be an abdication of our responsibility.

Perhaps the majority's unspoken concern is that it would be unfair to the parties to

decide an issue on a rationale the parties did not think of and have not had a chance to

argue, or that, in deciding on a ground the parties have not briefed or argued, the Court

may be missing something that would alter our decision.  In some cases, those concerns

are plainly legitimate.  Other appellate courts, including the United States Supreme Court,

regularly address them in a time-honored way, by asking for supplemental briefs on the

question, either before or after argument, or by scheduling reargument once the new

rationale has been identified.

---

[1] A different set of considerations, not relevant here, prevents us from reaching errors that could have been corrected if they had been raised in the court of instance (see e.g. People v Alfaro, 66 NY2d 985 [1985])

At a minimum, if it appears to the Court that there is a material rationale, missed by the parties, that might alter the decision (or, more importantly, the perception of the rule that emanates from the decision), we should make certain to identify it as one we are not reaching, so that the sweep of the opinion is not mistaken by those who rely on our decisions, and so that future litigants can test that rationale should it matter to them. Without someone – here, me – flagging an argument that the parties have missed, persons seeking access to ballot images might conclude they could not seek them, or perhaps could not request them under FOIL until two years had elapsed, at which moment the ballots could lawfully be destroyed. I am not so foolish to think that a "lone dissent" constitutes the law, nor foolish enough to believe it is purposeless.

For these reasons, I respectfully dissent.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Order reversed, with costs, and petition dismissed in its entirety. Opinion by Chief Judge DiFiore. Judges Fahey, Garcia and Feinman concur. Judge Stein dissents and votes to affirm in an opinion in which Judge Rivera concurs. Judge Wilson dissents in a separate opinion.

Decided June 13, 2019